## SUPERIOR COURT.

CHARLES D. FREDRICKS, GEORGE PENABERT and LOUIS LE BLANC agt. CONSTANT MAYER and JEREMIAH GURNEY.

An *artist* who has entered into a written agreement to perform his professional services for a party, for a limited time, at a stipulated price, and binds himself not to work for any other house or person during said time; and the agreement is mutual that the party who engages shall employ and pay him according to the agreement, may be *restrained by injunction*, from performing such services during the term, for any other person than the party to the agreement, without the consent of the latter.

The *principle* is this: That services which involve the exercise of *powers of mind*, which, in many cases, as of writers and performers, are purely and largely intellectual, may form a class in which the court will interfere; such services are generally individual and peculiar. They exist in nature, or in degree, with some modification of character, or expression in the one person. This *element of mind* exhibited in the subject of the contract, as distinguished from what is *mechanical* and *material*, furnishes a rule of distinction and decision.

*Special Term, Feb.,* 1857.
MOTION for injunction.

A. R. Dyett, *for plaintiffs.*

F. Howland, *for defendants.*

Hoffman, Justice. The plaintiffs state themselves to be partners, doing business in Paris, as photographists, and in the city of New-York under the name of Charles D. Fredricks. That on the 2d of June, 1855, they entered into a written contract with the defendant Mayer, which is annexed to the complaint, and is as follows:—

"Fredricks, Penabert & Le Blanc, photographists, 40 Rue Basse au Rempart, Paris, New-York and St. Louis, United States, of the first part, and Constant Mayer, artiste painter, of the second part, do hereby agree to the following, viz.:—

"*Art.* 1. Fredricks, Penabert & Le Blanc agree to employ, for three years, Mr. Mayer, as artist painter.

"*Art.* 2. Mr. Mayer agrees, on his part, to retouch in oil the photographic proofs, and everything which appertains to an artist in that style, for the house in New-York, United States; and he hereby binds himself not to work for any other house or person during the term of this contract, excepting Fredricks, Penabert & Le Blanc.

"*Art.* 3. Mr. Mayer, at the requisition of Fredricks, Penabert & Le Blanc, will proceed to New-York, United States, where he will place himself at the disposition of Mr. Fredricks for the above-mentioned term of three years, commencing from the day of the arrival of Mr. Mayer at New-York; the expenses of the voyage in going will be paid by Fredricks, Penabert & Le Blanc. Mr. Mayer is entitled to a passage in the second cabin of a steamer for passengers.

"*Art.* 4. Fredricks, Penabert & Le Blanc agree to pay to Mr. Mayer the sum of eight thousand francs per annum, payable monthly.

"*Art.* 5. Mr. Mayer agrees to execute his work in all good conscience.

"Done in triplicate between us in good faith, Paris, 2 June, 1855."

Signed by the parties.

Fredricks and others agt. Mayer and Gurney.

The defendant arrived in New-York about the 10th of July, 1855, and was employed by Fredricks immediately, and so remained till about the 1st of September, 1856, when he left such employ, and went into that of the defendant Gurney, in violation of his agreement with the plaintiffs.

The plaintiffs allege, that he was for that period of time in their employ, was paid by them, and broke his contract with them by entering into the service of Gurney. The action is to compel him to fulfil that contract, to enjoin him (for such purpose) from serving any other person, in his business, and for damages.

The case is first to be considered upon the supposition that the facts alleged by the plaintiffs are uncontroverted and unmodified. It is insisted that the law gives the plaintiffs a full right to an injunction in cases of this character.

In England, till the late decisions of *Lumley* agt. *Wagner*, (1852, 23 *Law & Ex. Rep.* 252,) *Hooper* agt. *Broderick*, (11 *Simons*, 47,) *Rolfe* agt. *Rolfe*, (15 *Simons*, 88,) the question could not be treated as settled in favor of the jurisdiction. The case of *Kemble* agt. *Kean*, (6 *Simons*, 333,) was, however, supposed to decry it. In our own courts, there are the cases of *Rivafinoli* agt. *Casetti*, (4 *Paige*, 264,) of *Hamblin* agt. *Dinneford*, (2 *Edw. Ch. Rep.* 529,) and of *Sanquirico* agt. *Benedetti*, (1 *Barb. Rep.* 315, *special term.*)

In *Rivafinoli* agt. *Casetti*, Chancellor WALWORTH discharged a *ne exeat*, which had been issued to prevent a singer at an opera from leaving the country. This was done upon the ground that the contract itself had not yet come into force, and the party could not be arrested in anticipation of an intent to break it. The learned chancellor did indulge in the flight of fancy that a law upon the case might be found in the adage, that a bird who could sing, and would not sing, might be made to sing. But his reasoning soon put down his humor.

In *Hamblin* agt. *Dinneford*, Vice-Chancellor M'COUN dissolved an injunction, which he had granted, in the case of a contract with an actor to perform at one theatre, and not to perform at any other. He did so expressly on the ground that

as he could not enforce the agreement to act, he could not that to refrain. It was a case between employer and employee, and the parties must be left to law.

The same decision was made by Mr. Justice EDWARDS, in *Sanquirico* agt. *Benedetti*, where the contract was to sing at operas and concerts, and not to make engagements with any other persons. He cites *Kemble* agt. *Kean* in point.

On the other hand, the English cases I have referred to have, upon great consideration, laid down a different rule: the last (*Lumley* agt. *Wagner*) is the most important. The plaintiff had entered into a written contract with *Ma'lle Wagner*, cantatrice of the king of Prussia, for her services for three months, at his theatre in London, upon certain terms; and there was a condition inserted that she should not use her talents at any other theatre, nor in any concert nor re-union, public or private, without the written authorization of the plaintiff. Ma'lle Wagner subsequently entered into an agreement with the defendant Gye, to abandon her contract with the plaintiff, and to sing at the "Royal Italian Opera," Covent Garden.

The bill was for an injunction, to restrain her from performing or singing at the latter place, or any other place, without the written permission of the plaintiff. Vice-Chancellor PARKER granted the writ, and a motion to dissolve it was heard before the lord chancellor, Lord ST. LEONARDS. He adverts to the many cases, such as upon leases, in which there may be numerous affirmative covenants, and perhaps but one negative covenant, such as not to cut timber. The court does not ask what is to be performed under the contract, but gives effect to the negative contract, and specifically executes it by prohibition. The contract here was one contract. Without the express relation to that effect, an agreement to perform for three months at one theatre, must exclude the right to perform, during that time, at any other. Her capacity and physical powers were to be exerted to aid the theatre to which she had attached herself; and she would have violated the true spirit and meaning of her contract by entering into any other.

"The principle of the jurisdiction of the court was, to bind

men's consciences to a fair and liberal performance of their en-
gagements.   I have always thought that you might attribute
much of the right feeling and fair dealing which exists between
Englishmen to the exercise of this jurisdiction.   Men are not
suffered, by the law of this country, to depart from their con-
tracts at their pleasure.   It does not leave the party, with
whom the contract has been broken, to the mere chance of
what a jury may give in the shape of damages; but it enforces,
where it can, the literal performance of the contract: and this,
I believe, has mainly tended to ·produce the good faith which
exists to a greater extent in this country than in many others."

After going through many other cases, the lord chancellor
observed, "Where is the mischief of exercising this jurisdic-
tion?   I cannot compel her to perform, of course.   That is a
jurisdiction the court does not possess; and it is very proper it
should not possess it.   But what cause of complaint is it, that
I should prevent her from doing an act which may compel her
to do what she ought to do?   Though I cannot compel the exe-
cution of the whole of the contract, I leave nothing unaccom-
plished which I hold it to be in the power of the court to ac-
complish.   By preventing her from doing the act, there will
be no case in an action by Mr. Lumley against her, for such an
amount of vindictive damages, as a jury might probably be dis-
posed to give, if she exercised her talents in a rival theatre."

The motion to dissolve the injunction was denied.

*Rolfe* agt. *Rolfe*, (15 *Simons*, 88,) was an injunction to re-
strain the defendant from carrying on the business of a tailor
within twenty miles of Cornhill.   There was a covenant on
the part of the other party to employ him, and on his, to work.
The injunction was granted as to the restriction.

*Hooper* agt. *Broderick*, (11 *Simons*, 47,) was a case in which
an order for an injunction, restraining the defendant from shut-
ting up an inn, was denied, as it would be compelling him to
keep one; but the order as to restricting him from opening an-
other was allowed.

But our courts may well pause before they adopt a rule capa-
ble of very dangerous application, and incapable of a strict

limitation. No one contends that such a remedy is to be applied to all the restrictive covenants, as to trades, artisans, or other ordinary transactions of business, which we find in agreements. That would infringe a rule of extensive application— that an injunction shall not be allowed when adequate damages for the injury can be recovered at law, and the contract relates to formal acts. (*Haight* agt. *Badgley*, 15 *Barb. S. C. Rep.* 500, *and cases; Willard's Eq. Juris.* 276, 277, 347.)

There are some cases, indeed, in which the mind is struck at once with the difficulty of any satisfactory measure of damages. There are others in which the nature of the services renders any other mode of redress inadequate, either for the private injury or the just condemnation of the breach of faith.

I look upon the case of the employment of a great actor as partaking of both these elements. The qualities which Cicero applauded in Roscius—which he declares to be essential to the formation of a consummate orator, (*De Oratore, Sect.* 26,) were, to those for whose benefit they are exercised, celebrity and profit undefined, and inappreciable by ordinary rules. The cases of attorneys' clerks under articles, involve not merely the loss of services, probably easily replaced, but the disclosure of professional confidence, and the checking of looseness of principle in those who are educated for the high profession of the law.

I am inclined to the opinion that services which involve the exercise of powers of the mind, which in many cases, as of writers and performers, are purely and largely intellectual, may form a class in which the court will interfere: such services are generally individual and peculiar. They exist in nature, or in degree, with some modification of character or expression, in the one person. This element of mind, exhibited in the subject of the contract, as distinguished from what is mechanical and material, may, perhaps, furnish a rule of distinction and decision.

2d. But the present application must, I think, fail upon another ground. The plaintiffs had no house of business in New-York. Fredricks lived and did business here in partnership

with Gurney. Penabert resided in Philadelphia, and never appears to have asserted any claim to the defendant's services as a member of the firm or otherwise. Fredricks and Gurney paid the expenses of his voyage and his salary. Fredricks appears to have treated him as entirely fulfilling his contract when working for Fredricks and Gurney. But what is decisive of the case is the paper of February 9th, 1856. Fredricks and Gurney give a written permission to the defendant to go to Philadelphia for fifteen days; his work to be paid for by Mr. Penabert: and he swears that Mr. *Penabert* there employed him, and paid him. As to Penabert & Fredricks, therefore, it is clear, that the duty of the defendant was owing to Fredricks and Gurney. The latter, since the dissolution of the firm, has an equal right to those services with the former.

The injunction is denied, with $10 costs.