## McCAULL *v.* BRAHAM.

(*Circuit Court, S. D. New York.* March 20, 1883.)

1. CONTRACTS—ARTISTS' SERVICES—EXCLUSIVE RIGHTS—DAMAGES—INJUNCTION.
    Contracts for the exclusive services of distinguished artists in theatrical representations are personal and peculiar. Damages for violation of such contracts are not capable of definite determination, and violations of them may be properly restrained by injunction. Where damages for the violation of a covenant are liquidated by agreement, *semble*, an injunction will not be allowed.

2. SAME—PENALTY—LIQUIDATED DAMAGES.

    A mere penalty designed solely tó secure observance of a contract will not be construed as liquidated damages nor prevent an injunction.

3. SAME—THREATENED VIOLATION OF CONTRACT—INJUNCTION.

    When the contract for the exclusive services of a singer in opera provided for " the forfeiture of a week's salary, or the termination of the engagement at the manager's option, without debarring him from enforcing the contract as he might see fit," *held*, that this clause was not liquidated damages, and that an injunction should issue to restrain a threatened violation of the contract. An injunction should not be permitted to be used as a means of indirectly enforcing collection of a disputed claim. *Conditions to that effect imposed.*

In Equity.

*A. J. Dittenhoefer*, for plaintiff.

*Howe & Hummel*, for defendant.

BROWN, J. This action was brought in the state court to restrain the defendant, Helen Braham, otherwise known as Lilian Russell, from violating her agreement with the plaintiff by singing during the current season in any other employment than at the plaintiff's theater, which the complaint alleges she is about to do. A preliminary injunction having been obtained at the time of the commencement of the action, the cause was removed by the plaintiff to this court before answer; and the defendant now moves upon affidavits to dissolve the injunction. By the agreement in writing between the parties, the defendant agreed to sing in comic opera in the employment of the plaintiff whenever required during the season of 1882 to 1883, commencing on or about September 1, 1882, at a stipulated weekly salary. By article 1 the agreement provides that "the artist is engaged exclusively for Mr. John McCaull, and during the continuance of this engagement will not perform, sing, dance, or otherwise exercise her talent in theater, concert halls, churches, or elsewhere, either gratuitously or for her remuneration or advantage, or for that of any other person or other theater or establishment (although not thereby prevented from fulfilling her engagement with Mr. McCaull) without having first obtained permission in writing of Mr. McCaull; and for each and every breach of this rule the artist shall forfeit one week's salary, or her engagement, at the option of Mr. McCaull; but such forfeiture of one week's salary shall not be held to debar Mr. McCaull from enforcing the fulfillment of this contract in such a manner as he may think fit."

By article 3 it is provided that "no salaries will be paid for any night or days on which the artist may not be able to perform through illness or other unavoidable cause; and the artist absenting herself, except from illness or other unavoidable cause, will forfeit one week's

salary, or her engagement, at the option of Mr. McCaull, and will also be held liable for any loss that may be sustained by Mr. McCaull owing to such absence. Illness, to be accepted as an excuse, must be attested by a medical certificate, which must be delivered to Mr. McCaull or his representative as early as possible, and before the commencement of the performance. Should such absence exceed two weeks, the engagement may be canceled at the option of Mr. McCaull."

The defendant entered upon the performance of her engagement at the Bijou Opera House in this city in September, 1882, with great success, which was continued until prevented from further performance by protracted illness. Having partially recovered, she attempted to renew her appearances, but after three nights' performances, in December, she suffered a relapse from which she did not recover until about the middle of February, 1883.

By the written contract the plaintiff was to furnish all costumes. This was modified, prior to September, by an oral agreement by which the plaintiff was to pay a larger salary and the defendant to furnish her own costumes. Both parties agree as to the modification of the contract to this extent. The defendant contends that in addition to the above the oral contract was further modified by the plaintiff agreeing to pay her weekly salary as at first fixed during the continuance of any illness; that the sum of about $350, paid to her by the plaintiff during her illness, was paid in pursuance of this modification of the contract; and that since the middle of December the plaintiff has refused to continue such payment during that part of her illness, in violation of the agreement as modified.

The plaintiff denies that the modification of the contract included any agreement to pay her during illness, and asserts that the moneys actually paid her while ill were merely advances on account of future salary to be earned, and so expressly stated at the time. Each party sustains its respective claims in this respect by several witnesses. They leave this branch of the subject in so much doubt that I feel obliged to reject it from consideration, without prejudice to either in regard to their mutual claims in respect to it, since neither party made it a ground of terminating the contract.

Up to the time this action was commenced the defendant had given no notice to the plaintiff terminating the agreement; nor had the plaintiff, as he might have done according to the express provision of the agreement, notified the defendant that it was canceled, owing to her absence beyond two weeks. I must, therefore, hold the agree-

ment as still in force. Contracts for the services of artists or authors of special merit are personal and peculiar; and when they contain negative covenants--which are essential parts of the agreement, as in this case, that the artists will not perform elsewhere, and the damages, in case of violation, are incapable of definite measurement, they are such as ought to be observed in good faith and specifically enforced in equity. That violation of such covenants will be restrained by injunction, is now the settled law of England. *Lumley* v. *Wagner*, 1 De G., M. & G. 604; *Montague* v. *Flockton*, L. R. 16 Eq. 189, 199.

The subject was exhaustively considered by FREEDMAN, J., in the case of *Daly* v. *Smith*, 49 How. Pr. 150, in whose conclusions, in accordance with the English cases above cited, I fully concur. In the present case it is, however, urged that the remedy by injunction should not be allowed, on the ground that the plaintiff's damages have been liquidated by the first article of the contract above quoted; namely, that "for each and every breach of this rule the artist shall forfeit one week's salary;" and the cases of *Barnes* v. *McAllister*, 18 How. Pr. 534; *Nessle* v. *Reese*, 29 How. Pr. 382; *Mott* v. *Mott*, 11 Barb. 127, 134; and *Trenor* v. *Jackson*, 46 How. Pr. 389, are cited in support of this view.

There is no doubt of the general principle that where the damages for the violation of a covenant are either liquidated by the agreement, or may be easily and definitely ascertained, the parties will be left to their remedy at law. But it is clear that in cases of contract like the present, the damages are not capable of being definitely ascertained or measured; and in the cases first above cited, injunctions were for that reason allowed. The only question in this case, therefore, which distinguishes the present agreement from those, is whether the provision for the forfeiture of a week's wages for every violation of article 1 is such a liquidation of the damages as bars the remedy by injunction. In *Barnes* v. *McAllister* and in *Nessle* v. *Reese* and *Mott* v. *Mott*, *supra*, there was a covenant to pay a specific sum for failure to observe the covenant in these cases; and these sums were held by the court to be strictly liquidated damages.

Where the provision of the contract is in the nature of a penalty, and not liquidated damages, it is well settled that such a provision will not prevent the remedy by injunction to enforce the covenant specifically; and the provision will be construed as a penalty, and not as liquidated damages, where its plain object is to secure a performance of the covenant, and not intended as the price or equivalent to

be paid for a non-observance of it. *Howard* v. *Hopkyns*, 2 Atk. 371; *Bird* v. *Lake*, 1 Hem. & M. 111; *Fox* v. *Scard*, 33 Beav. 327; *Sloman* v. *Walter*, 1 Brown, C. C. 418; *Jones* v. *Heavens*, 4 Ch. Div. 636.

Whether the language of the contract is to be construed as a penalty or as liquidated damages is to be determined from its language and its presumed intent to be gathered from the circumstances of the parties and the nature of the agreement. "A penalty," says Lord LOUGHBOROUGH, in *Hardy* v. *Martin*, 1 Cox, Ch. 26, "is never considered in this court as the price of doing a thing which a man has expressly agreed not to do; but if the real meaning and intent of the contract is that a man should have the power, if he chooses, to do a particular act upon the payment of a certain specified sum, the power to do the act upon the payment of the sum agreed on is part of the express contract between the parties." *Vincent* v. *King*, 13 How. Pr. 234–238; Kerr, Inj. 409.

In *Coles* v. *Sims*, 5 De Gex, M. & G., Lord Justice TURNER says, upon this point, (p. 1:) "The question in such cases, as I conceive, is, whether the clause is inserted by way of penalty or whether it amounts to a stipulation for liberty to do a certain act on the payment of a certain sum."

That the clause providing for the forfeiture of one week's salary for each violation of this contract was in the nature of a penalty, and designed solely to secure the observance of article 1, is manifest both from the general nature of the employment and the requirements of a manager of opera, as well as the express language of this article; because (1) the stipulation is not for the payment of a certain sum as liquidated damages, but only for the forfeiture of a week's salary; (2) it gives an option to the plaintiff, instead of such forfeiture, to annul the engagement; (3) it declares that such forfeiture shall not disbar the plaintiff from enforcing the fulfillment of this contract in such a manner as he shall think fit, i. e., by any available legal or equitable remedy. As the remedy by injunction is one of the remedies available, this language is equivalent to an express declaration that the provision for the forfeiture of a week's salary for each violation shall not affect his right to a remedy by injunction. This last stipulation would not, indeed, influence the court, provided it was clear that the damages were intended to be liquidated at a specific sum, for which the defendant was to have the option of singing at any other theater. But these several clauses taken together show conclusively that no such thing was intended, and that the sole object was to secure the specific observance of the contract that the defend-

ánt should not sing elsewhere; and the plaintiff is therefore entitled to restrain the violation of it. As the season will close on May 15th and the contract then terminate, there are certain equitable conditions which should be observed, and which it is competent for the court, in continuing the injunction, to impose. *Russell* v. *Farley,* 105 U. S. 433, 438.

The injunction of this court must not be used directly or indirectly to enforce the collection by the plaintiff of his alleged but disputed claim for previous advances, through the non-payment of salary hereafter earned, at least until his right is legally adjudicated. (2) Considering the short period remaining, the defendant must not be sent to California, where by the contract she might have been taken without salary *en route* going and returning; nor, having respect to her precarious health, should she be sent to any very distant point; (3) the plaintiff should furnish satisfactory security for the prompt payment weekly for the defendant's services at the rate of $150 per week, the contract price, from the time the defendant gives notice in writing of her readiness to sing under the contract, so long as she shall continue in readiness to perform her duties.

In case of failure to pay any future salary earned, tne defendant may apply, on two days' notice, to the plaintiff's attorneys for the dissolution of this injunction.

An order may be entered continuing the injunction subject to the above provisions and conditions.

---

ENJOINING EMPLOYE FROM SERVING RIVAL OF EMPLOYER. The decisions upon the judicial enforcement of the stipulations common between actors, artists, authors, lecturers, or other professional workers and their employers, that the employe shall not exercise his skill and talent for any other person, are not very numerous, and are somewhat conflicting; but they establish the modern general doctrine to be that the employer is not obliged to submit to a breach of the covenant, and content himself with an action for damages, but, in a proper case, may have an injunction restraining the employe from engaging in any rival service; and this, whether compelling the latter to perform his affirmative engagement to labor for his employer is practicable or not. To reconcile the decisions would be difficult, except upon the explanation that, when suits of this nature were first brought, the inadequacy of the action for damages, as a remedy, was not fully perceived; but that, gradually, as one case after another was presented, it became better understood, and equity judges grew more prompt and willing to exercise their jurisdiction on the ground that employers of public performers cannot well be compensated in damages for departures of artists from their establishments. If an actor, continuing to perform for his general employer, according to his engagement,

plays on "off nights" for a rival theater, the question how much the receipts of his employer have been diminished by the opportunity given the public of hearing the favorite elsewhere, is too vague and uncertain to be shown by legal proof. And if, as is frequently the case, he withdraws from his first engagement wholly, and devotes himself to the service of a competitor, the question of damages is rendered still more perplexing by the difficulty of showing what profits the deserted manager would have realized had the performances been continued as agreed; and the latter needs, also, to have some indemnity, difficult to be estimated in money, for his liability to refund for tickets or boxes sold in advance, and for his loss of prestige through failure of his announced entertainments. Obviously courts of justice cannot compel public performers or members of the professions to perform specific services they have promised; there are no means at the command of a tribunal for compelling a person to act, sing, speak, or write, nor is there any standard for determining whether one has done so in good faith and with his best skill. The result, therefore, is that a properly-framed stipulation, in a contract for services of this description, forbidding the employe to serve elsewhere, may be enforced by injunction. Such injunctions are equally obtainable under the codes of procedure, upon complaint in a civil action; or, in states adhering to the old practice, upon bill in equity; or, in the United States circuit court, sitting in equity, if the parties are citizens of different states.

In what cases the fact that the contract of the parties, by liquidating the damages or otherwise, gives the employer a better remedy by action than usual, precludes his resort to injunction, is the question particularly discussed in the text, and nothing need be added to Judge BROWN's able and lucid exposition of the principles governing that branch of the subject. This note will indicate the development of the general power of equity to enjoin in these cases.

EARLY ENGLISH DECISIONS went upon the theory that although an independent, simple covenant not to undertake specified services may be enforced, when reasonable and consistent with public policy, yet in a contract between A. and B. that B. shall act or sing, etc., for A., and shall not perform for any one else, the negative clause is merely incidental to the affirmative; and unless the case is one in which the court can enforce the affirmative stipulation it ought not to enjoin a proposed breach of the negative. These decisions, therefore, generally denied A.'s prayer for an injunction to restrain B. from performing in the employment of C., unless some special ground of equitable jurisdiction over the case existed. The following are illustrative cases: Price agreed to prepare exchequer reports for Clarke to publish, without, however, engaging not to write for any one else. The lord chancellor refused an injunction, saying that as he had no jurisdiction to compel Price, directly, to write reports for Clarke, he ought not to do so indirectly, by forbidding him to write for any one else.(a) A similar application was denied for the same reason, where the engagement of the Society for the Diffusion of Useful Knowledge with Baldwin's publishing firm was simply to furnish them with certain maps and charts for publication, a thing which the court had no means of compel-

(a) 1819, Clarke v. Price, 2 Wils. Ch. 157.

ling directly.(b) The actor Kean was advertised to play at Drury Lane the-ater, while there was yet 10 days unexpired of a prior engagement at Covent Garden. The vice-chancellor denied the application of the Covent Garden proprietors to enjoin him, for the same reason, viz., that there was no jurisdiction to compel him to perform his 10 days' service.(c) Upon examination of a special agreement for mercantile services'of defendant, containing a stipulation forbidding his working for any other house, the affirmative stipulations of the contract were pronounced too vague and too onerous towards the employe to allow of decreeing a specific performance, and the court would not enjoin the breach of the negative covenant alone.(d)

Upon the other hand, the case of *Morris* v. *Colman*(e) illustrates the principle that a covenant not to serve may be enforced by injunction where other facts give equitable jurisdiction of the controversy. Colman, noted as a dramatist, became manager of the Haymarket theater, under an agreement in the nature of a copartnership, which contained a clause restraining him from writing dramatic pieces for any other theater. In a suit which arose between the parties interested in the management, the validity of this clause was questioned before Lord Chancellor ELDON. He pronounced it valid and enforceable, it being between partners, and being neither contrary to public policy nor unreasonable as between the parties. The decision has generally been explained in later cases on the ground that the stipulation was one of several in an agreement of copartnership, and that equity has jurisdiction of disputes among partners, though this explanation has been questioned.(f)

EARLY AMERICAN DECISIONS ran in the wake of the English; our courts did not deny the jurisdiction, but were loth to exercise it. De Rivafinoli, while manager of the Italian theater in New York, engaged Corsetti as first bass in operas, the latter agreeing not to make use of his talents in any other theater. But before the opening of the season Corsetti was announced to sail for Cuba, to perform there under another manager. De Rivafinoli then sought an injunction, (and *ne exeat*,) which Chancellor WALWORTH refused, on the ground that under the circumstances the application was premature, for before commencement of the actor's engagement the manager could not have a right of action. On the general question he said, in effect, that while it is theoretically proper that "a bird that can sing and will not sing must be made to sing," yet there is an obstacle to making a vocalist sing by order of the court of chancery, in the fact that no officer of the court has that perfect knowledge of the Italian language, or possesses that exquisite sensibility in the auricular nerve, which is necessary to the understanding and enjoyment of Italian opera; and it would be difficult for a master to determine whether a defendant sang in faithful performance of his engagement, or ascertain what effect the coercion might produce upon his singing, especially in the livelier airs.(g) Similar considerations led EDWARDS, J., to refuse a similar application in *Sanquirico* v. *Benedetti*.(h)

The comedian Ingersoll agreed with Hamblin, the manager of the Bowery

---

(b) 1838, Baldwin v. Society D. U. K. 9 Sim. 393.

(c) 1829, Kemble v. Kean. 6 Sim. 333.

(d) 1836, Kimberley v. Jennings, 6 Sim. 340.

(e) 18 Ves. 437, (1812.)

(f) 2 Phillips, 597.

(g) 1833, De Rivafinoli v. Corsetti, 4 Paige, 264.

(h) 1 Barb. 314.

theater in New York, to play for him for three years, also, not to act except for Hamblin during the term; but an injunction was refused because there was no ground of jurisdiction over the affirmative part of the agreement, while the negative was a mere matter between employer and employe.(*i*)   When Burton, the famous comedian of a generation ago, was manager of Front-street theater, Baltimore, he bargained with Burke to withdraw Mrs. Burke's services from the employment of Manager Marshall and bring her to join Burton's company.   Marshall then sued for an injunction, which was issued below.   On appeal the court held that either of three facts shown, viz., there was no express restrictive clause in the contract between the Burkes and complainant; complainant was prosecuting an action at law; and Mrs. Burke's engagement, if any, would be void as that of a *feme covert*,—was enough to defeat the suit.(*j*)   *De Pol* v. *Sohlke*(*k*) was decided after *Lumley* v. *Wagner*,(*l*) yet does not mention it, but takes the older doctrine for granted. The opinion assumes, however, that irreparable damage to follow from a breach of a negative covenant may be ground of equitable jurisdiction, and the judge refused to enjoin the *danseuse* Sohlke from performing for other employers, not for want of power, but because, as the plaintiffs had not a theater in operation in which they could use her services, therefore they could not be irreparably damaged by her dancing elsewhere for the time being. Thus American as well as English courts, down to the middle of our century, were unwilling to enjoin an employe's breach of a collateral promise not to serve elsewhere, unless the affirmative engagement were a proper subject-matter of equitable relief.

DEVELOPMENT OF THE MODERN DOCTRINE.   Since about 1850 a broader and more liberal position has been taken.   An advance was distinctly made in *Dietrichsen* v. *Cabburn*(*m*) and *Rolfe* v. *Rolfe*,(*n*) (both 1846,) in which the rule adverse to enforcing a negative stipulation was distinctly questioned and limited; though these were not cases of professional services, but of contracts for exclusive employment in mercantile duties.   The circumstances of a controlling decision,(*o*) which soon followed them, were that Manager Lumley engaged Mlle. Johanna Wagner to sing at Her Majesty's theater, London, for three months, in certain specified operas, at a weekly salary of £100.   The agreement, as originally signed, did not in so many words forbid her from singing for any other employer; but a few days afterwards the manager objected to the omission, and Mlle. Wagner's agent then added an article, saying: "Mlle. Wagner engages herself not to use her talents at any other theater, nor in any concert or reunion, public or private, without the written authorization of Mr. Lumley."   Notwithstanding this, she did accept (for a higher salary, it was said) an engagement from Manager Gye to sing at the Italian opera, Covent Garden, and Lumley sued for an injunction.   It was granted below.(*p*)   On appeal the familiar objection was urged that equity will not enjoin the breach of a negative covenant where it cannot decree per-

(*i*) 1835, Hamblin v. Dinneford, 2 Edw. Ch. 529.
(*j*) 1846, Burton v. Marshall, 4 Gill, 437.
(*k*) 7 Robt. 280, (1857.)
(*l*) Infra.

(*m*) 2 Phillips, 52.
(*n*) 15 Sim. 88.
(*o*) Lumley v. Wagner.
(*p*) Lumley v. Wagner, 5 De Gex & S. 485.

formance of the affirmative one to which it is incident.(q)　But Lord Chancellor ST. LEONARDS said that when the reason why the court could not decree specific performance is not that the plaintiff is not entitled to it, but merely the want of means to compel the defendant to perform, he thought the court need not on that account refrain from doing what was within its power, viz., forbidding a performance which will violate the contract.　To the objection that there was a remedy at law by action for damages, the lord chancellor replied that such remedy was no better than exists upon covenants not to practice as attorney, surgeon, etc., within certain limits, which are often enforced by injunction.　Another objection was that the promise not to sing elsewhere was not in the original agreement; but the chancellor said that the two papers were not independent, but were in effect one contract; and that even if the stipulation not to sing elsewhere had never been made in writing, he thought it was implied in the original contract; in other words, singing for Mr. Gye was a breach of the spirit and meaning of the contract to sing for Mr. Lumley.　Another objection was that the injunction would be mischievous, because it would prevent a popular artist from singing at one theater, while the court could not promote her performing at another; hence the tendency would be to prevent the public from hearing her anywhere; but the chancellor said that the artist had no right to complain on this ground; the injunction would merely forbid her doing what she had engaged not to do.　The temporary injunction was, therefore, continued.(r)　The opinion embodies an elaborate review of the previous English cases on the extent to which equity may go in enjoining breach of negative covenants of various kinds; and the decision has been generally followed in both countries as establishing the jurisdiction to enforce contracts not to serve in public performances or intellectual work.

A firm of French photographists, Fredricks & Co., employed Constant Mayer as "artist painter" for three years, at an annual salary, to retouch proofs in oil at their New York house, and he engaged not to work for any one else; yet he left them and engaged with Gurney.　The question whether the court could grant an injunction was decided in their favor, the judge saying that this remedy is not applicable to all restrictive covenants, for many may be protected by action for damages; but contracts for employment of a great actor, or for services which involve exercise of high powers of mind peculiar to the one person, cannot be treated by ordinary rules, but require the special remedy of injunction.(s)　But, on the merits of the application under the particular circumstances, the judge denied it; and this was affirmed in *Fredricks* v. *Mayer*.(t)

Annetti Galletti agreed to dance at the Broadway Music Hall, New York, for six months at a weekly salary, and to "exercise her utmost abilities for the promotion of the exhibition."　But the agreement did not contain an express clause forbidding her to perform elsewhere; and on account of this omission the employer's motion for an injunction was denied.(u)

(q) 6 Sim. 333; Id. 340; 3 Mac. & G. 393.

(r) 1852, Lumley v. Wagner, 1 De Gex, M. & G. 604; 13 Eng. L. & Eq. 252.

(s) 1857, Fredricks v. Mayer, 13 How. Pr. 566.

(t) 1 Bosw. 227.

(u) 1861, Butler v. Galletti, 21 How. Pr. 465.

Hayes, manager of the Olympic theater in New York, engaged Willio to play at the Olympic for three months, and "not to perform at any other establishment," etc. After playing two months, Willio accepted an offer of a higher salary from a Boston theater. An injunction was granted, the court mentioning, with approval, the modern doctrine that a definite contract by an actor not to perform at any other theater than his employer's may be enforced; and saying that this remedy is not impaired by the Code of Procedure.(v)

Montague, manager of the Globe theater, London, engaged Flockton to act at the Globe, without exacting an express stipulation that he should not act elsewhere. But the vice-chancellor said that such a stipulation was implied. An engagement to perform for a definite term at one theater involves an engagement not to perform during the term at any other theater. When a person agrees to act at a particular theater, he agrees not to act anywhere else as plainly as if a negative clause were inserted.(w) And the same opinion was expressed, *obiter*, in *Fechter* v. *Montgomery*,(x) where the suit was by Fechter as manager; and, *ex parte*, in *Webster* v. *Dillon*.(y)

Manager Daly engaged Fanny Morant Smith to play at his theater in New York city during the seasons of 1874, 1875, and 1876, the contract containing a stipulation that she should not act during the term of the contract at any other New York city theater without his written consent; and that if she should attempt to do so, the plaintiff might, "by legal process, or otherwise, restrain her from so performing on payment to her, during such restraint," of one-fourth her salary under the contract. She, however, allowed herself to be advertised to play at a rival establishment, the Union-square theater, and he brought suit for an injunction. The New York superior court pronounced the stipulation not to perform, valid, and proper to be enforced by injunction; saying that, although the clause as to plaintiff's restraining a breach on paying a quarter salary could not give jurisdiction, yet, as the court had jurisdiction without it, the clause might be regarded as a guide in fixing the terms of the injunction. Therefore, the actress was enjoined from playing within the city, provided the manager should punctually pay to her one-quarter of her agreed salary.(z) The opinion has been commended for its review of the authorities.

For other cases in which the modern doctrine (of *Lumley* v. *Wagner*) has been incidentally recognized or discussed, and applied in a way not aiding materially to support it, see *Mapleson* v. *Bentham*,(a) where the vice-chancellor denied an application by Mapleson, lessee of the Royal Italian Opera, to enjoin his first tenor from singing elsewhere; *Wolverhampton, etc., Ry. Co.* v. *London, etc., Ry. Co.*,(b) involving an agreement relative to use of a railroad; and *Taunton Copper Manuf'g Co.* v. *Cook*,(c) in which an employe of a manufacturing company was enjoined from breaking his covenant with his employers that he would not for five years disclose their secrets or engage

(v) 1871, Hayes v. Willio, 11 Abb. Pr. (N. S.) 167.
(w) 1873, Montague v. Flockton, L. R. 16 Eq. Cas. 189; 28 L. J. (N. S.) 581.
(x) 33 Beav. 22.
(y) 3 Jur. (N. S.) 432.

(z) 1874, Daly v. Smith, 49 How. Pr. 150.
(a) 20 Weekly Rep. 176.
(b) L. R. 16 Eq. Cas. 433.
(c) Boston Law Rep. 547.

with any other employer; with which latter case compare *Estcourt* v. *Estcourt Hop Essence Co.*(d) Judge LOWELL's opinion in *Singer Sewing-machine Co.* v. *Union Button-hole, etc., Co.*(e) is an instructive discussion of the application of the doctrine to ordinary mercantile contracts, in which a promisor. agrees not to deal with any other than the promisee; with which case compare *Bickford* v. *Davis*(f) and *Fothergill* v. *Rowland.*(*) The suggestion made at the close of this note, that, since modern equity enjoins a breach of a contract not to reveal secrets of business,(g) of a contract not to write a particular description of book,(h) of a contract not to practice a particular trade or calling,(i) although in either case the injured party could maintain an action for damages, there is no good reason for refusing an injunction to forbid breaking a contract for exclusive professional services, is forcible and sound. A curious German case is recounted in 26 Alb. Law J. 3. Cases involving a claim of the artist that the manager first broke the contract by assigning the artist to a part or position less desirable than that which the contract assured, or by failing to give due opportunity for appearances, are: *Daly* v. *Smith,*(j) *Roserie* v. *Kiralfy,*(k) and *De Pol* v. *Sohlke.*(l)

MUST THERE BE AN EXPRESS NEGATIVE CONTRACT? Several English cases support the view that an engagement not to serve elsewhere is fairly to be implied from a contract, in general terms, to perform under one manager or at one establishment. But American judges have generally refused to interfere unless there were an express stipulation forbidding the service sought to be enjoined. In other words, in this country a simple engagement to serve leaves the employe at liberty to take other service, provided he faithfully performs the first engagement.(m)

FORM OF A RESTRICTIVE COVENANT. The restrictive clause may well be drawn in the following form—making variations appropriate to the circumstances of the particular case:

And it is further agreed, in consideration of the premises, that the party of the second part (*the actor, artist, or other employe*) will not, during the term of this agreement, exercise his professional skill and talents as an actor (*or artist, etc.*) in public, (within the city of New York, *or otherwise state the limits to which the restriction is intended to be confined; and the courts are more willing to enforce these restrictions when the locality is limited,*) either for compensation or gratuitously, and either upon his own account or for another employer or establishment, without the consent in writing of the party of the first part first obtained, under pain of injunction, action for damages, or any other available judicial remedy: *provided,* however, that the party of the second part may at any time and as often as he thinks fit perform gratuitously at any entertainment charitably given for the burial expenses and relief of the family

(d) 32 Law T. (N. S.) 80; reversing S. C. 31 Law T. (N. S.) 567; Gower v. Andrew, 14 Cent. L. J. 50; and Deming v. Chapman, 11 How. Pr. 382.

(e) 1 Holmes, 253.

(f) 11 FED. REP. 549.

*L. R. 17 Eq. 132. See, also, a note by E. H. Bennett, to Bowen v. Hall, 20 Am. Law Reg. (N. S.) 578, 587.

(g) 9 Hare, 241; 9 Eng. L. & Eq. 182.

(h) 2 Sim. & S. 1; 18 Ves. 437.

(i) 125 Mass. 258; 16 Vt 176; 22 Law Rep. 693; 5 Jur. (N. S.) 976; 15 Sim. 88.

(j) 49 How. Pr. 150.

(k) 12 Phila. 209.

(l) 7 Robt. 280.

(m) Burton v. Marshall, 4 Gill, 487; Butler v. Galletti, 21 How. Pr. 465; Wallace v. De Young, 98 Ill. 633. But compare Taunton Copper Manuf'g Co. v. Cook, Bost. Law Rep. 547, 549.

of a deceased actor, (*or otherwise state explicitly any right which the actor desires to reserve.*)

PROCEDURE. Several of the cases indicate that it is proper to join the second employer as co-defendant, and to draw the injunction so as in terms to forbid him to employ the chief defendant, as well as prohibit the latter from performing.(*n*) Whether the practitioner may have a *ne exeat* as well as injunction, see *De Rivafinoli* v. *Corsetti.*(*o*) What action lies in behalf of an injured manager or other employer against a rival or competitor for inducing artists of his company or employes in his establishment to leave his service, see *Bowen* v. *Hall.*(*p*)                    BENJAMIN VAUGHN ABBOTT.

*New York, N. Y.*

(*n*) Clarke v. Price, 2 Wils. Ch. 157 ; Lumley v. Wagner, 1 De Gex, M. & G. 604 ; Burton v. Marshall, 4 Gill, 487 ; Hamblin v. Dinneford, 2 Edw. Ch. 523.

(*o*) 4 Paige, 264 ; Sanquirico v. Benedetti, 1 Barb. 315; Hayes v. Wilho, 11 Abb. Pr. (N. S.) 167.

(*p*) 20 Am. L. Reg. (N. S.) 578, and note, Id. 587.