## Cain v. Garner, et al.

(Decided April 25, 1916.)

### Appeal from Fayette Circuit Court.

1. Contracts—Services of Artists—Damages for Violation of Contract—Injunction.—Contracts for the services of artists of special merit are personal and peculiar; and, when they contain negative covenants which are essential parts of the agreement, and to the effect that the artist will not perform elsewhere, and the damages, in case of violation, are incapable of definite measurement, they are such contracts as ought to be observed in good faith, and a violation thereof will be restrained by injunction.

2. Divorce—Custody of Children—Judgment as to Annulled by Remarriage.—Where a wife obtained a divorce from her husband and the custody of her infant son in 1905, and the husband and wife remarried in 1906, the remarriage annulled the judgment of divorce in so far as it applied to the custody of the infant son, and restored the parents to all their rights over their son as if they had never been divorced.

3.   Infants—Avoidance of Contract.—Except for necessaries, an infant may avoid any contract made by him during infancy.

4. · Infants—Contract Made for—When Not Binding.—An infant is not bound by a contract made for him or in his name by another person purporting to act for him, unless such person has been duly appointed his guardian or next friend, and authorized by the court to act and bind him.

5.   Infants—Avoidance of Contract.—An executory contract made by a father for the personal services of his son, may be avoided by the son at his election.

ALLEN & DUNCAN for appellant.

J. P. JOHNSTON and GEORGE C. WEBB for appellees.

OPINION BY CHIEF JUSTICE MILLER—Dissolving injunction.

This action was brought by the plaintiff, W. M. Cain, to compel the defendant, Mack Garner, an infant sixteen years of age, to specifically perform a contract to render personal services as a jockey for the plaintiff, and for an injunction prohibiting him from working for any other person.

Mack Garner and his parents, T. F. and Sarah M. Garner, are and were at the time the contract was made, residents of Centerville, Appanoose county, Iowa. On November 8th, 1905, T. F. and Sarah M. Garner were divorced from the bonds of matrimony by a judgment of the district court of Appanoose county, Iowa, and the custody of their infant children, including the defendant, Mack Garner, was awarded to the mother.

T. F. and Sarah M. Garner, however, lived separate and apart for only about eight months, and were then re-married to each other. They have since continuously lived together as husband and wife.

While at Butte, Montana, on July 14th, 1914, T. F. Garner made a contract with the plaintiff, Cain, whereby T. F. Garner undertook to bind his infant son Mack Garner to work for Cain as a stable boy and race rider, for a term of three years, for a compensation of $25.00 per month for the first year, $35.00 per month for the second year, and $50.00 per month for the third year, to be paid to the father. The contract, which purported to be the act of Mack Garner, by his parents, was signed by Mack Garner, T. F. Garner his father, and W. M. Cain, and contained this clause:

"The said minor agrees not to leave the said services of his employer during term of service, and to faithfully, honestly and industriously serve said employer; to keep all his secrets, and to readily obey all the lawful directions and instructions of the said employer, or the said employer's duly authorized representative or trainer."

The infant Mack Garner consented to this contract, signed it as a party thereto, and immediately entered plaintiff's service. He had had no experience, however, in riding horses; but he was a bright boy and learned to ride rapidly, under the instruction of Cain. The value of a race rider in addition to his ability to ride at light weight, consists largely in his skill and judgment, as evidenced by his ability to get his mount away from the post in the most advantageous position, to properly rate his horse throughout the entire race, to save all the ground possible, and to take advantage of every opportunity during the race of getting the position most favorable to winning it.

Cain instructed Mack upon all these points, and gave him every opportunity to profit therein by having him ride in races so as to become an experienced jockey. By reason of his small stature, Mack was able to ride at 85 pounds; had good judgment; and used his head; and, under the tuition of Cain, he rapidly developed into a jockey of extraordinary skill and success. The contract permitted Mack to ride horses for outside parties, and in this way he earned several hundred dollars per month, in addition to his salary. Cain and one other witness testified that the contract by which Cain was entitled to the services of Mack for the remaining two and a half years covered thereby, was worth from $15,000.00 to $20,000.00 to Cain.

Mack remained with Cain during the race meetings in Helena, Mont., Oklahoma, Dallas and Juarez, Mexico, the last named place having been reached about October 1st, 1914. They remained at El Paso, Texas, participating in the races at Juarez, immediately across the river, until April 1st, 1915. During that meeting Mack improved rapidly, and at the close of the Juarez meeting on April 1st, he was considered by the racing profession as the best light weight jockey in America.

Mr. and Mrs. Garner visited their son Mack at El Paso; attended the races at Juarez; and witnessed many successes of their son as a rider. He frequently won from

two to four races in a day. Before leaving El Paso, Mrs. Garner expressed her approval of her son's business connection with Cain, saying that she hoped he and Mack would have a successful year, make lots of money, and that she would see them at the Lexington races in April.

While the parties were at El Paso, Cain learned that Mack had made, or was contemplating the making of, a contract to ride for the defendant Holland, and upon Cain's asking Mack and his father about it, Mack denied that he had made such a contract, or even contemplated doing so, saying that he intended to remain with Cain, who had befriended him by making him what he was as a race rider.

At the close of the race meeting at Juarez, Mack left El Paso for Lexington, Ky., going, however, by the way of Centerville, Iowa, to visit his parents who had preceded him. He was to join Cain in Lexington in time for the April races.

But, on March 1st, 1915, and while in Iowa, Mack Garner and Sarah M. Garner, his mother, entered into a contract with the defendant, James L. Holland, through his agents, Williams and Cassidy, by which Mack, who was then sixteen years of age, agreed to work for Holland as a stable boy and race rider for a term of three years, for a compensation of $200.00 per month, to be paid to the mother.

By a judgment of the district court of Appanoose county, Iowa, entered on April 19th, 1915, Sarah M. Garner was appointed guardian of Mack Garner's property, and the contract of March 1st, 1915, with Holland, was approved and ratified.

Shortly thereafter, Mack Garner appeared in Lexington, where he entered the service of Holland under the contract of March 1st, 1915, above referred to, and refused to carry out or even to recognize the contract with Cain.

On May 15th, 1915, Cain brought this action against Garner, alone, seeking to enforce his contract, and to enjoin Garner from riding for Holland. By an amended petition, Holland, and Williams and Cassidy, his agents, were made defendants; and, upon her petition, Sarah M. Garner, as guardian, was made a defendant, whereupon she filed her answer, counter-claim and cross-petition showing her appointment as guardian of her son Mack; the judgment of the Iowa court approving the con-

tract with Holland; and asked that the petition be dismissed.

Upon the trial the circuit court sustained plaintiff's motion for an injunction against the defendant Mack Garner, in part, by enjoining him from working for or serving any person except Cain. The defendants have applied to me as a judge of the Court of Appeals to dissolve the injunction.

Many interesting questions were presented upon the argument, all centering, however, around the validity and effect of plaintiff's contract of July 14th, 1914. If that contract is valid and binding upon the infant Mack Garner, the injunction was properly granted, since it is well settled that contracts for the services of artists of special merit are personal and peculiar; and when they contain negative covenants which are essential parts of the agreement, as in this case, that the artist will not perform elsewhere, and the damages, in case of violation, are incapable of definite measurement, they are such contracts as ought to be observed in good faith and specifically enforced in equity. That a violation of such covenants will be restrained by injunction, is thoroughly settled law, both in England and in America. Lumley v. Wagner, 1 De G., M. & G. 604; Montague v. Flockton, L. R. 16 Ed. 190; McCaull v. Braham, 16 Fed. 37, and Abbott's Note thereto; Philadelphia Ball Club v. Lajoie, 202 Pa. St. 210, 90 Am. St. Rep. 627 with Note, 58 L. R. A. 227; Pom. Eq. Jur. sec. 1343.

But the enforcement of plaintiff's contract depends upon its validity and binding force upon the infant Mack Garner. The validity of plaintiff's contract must be established before he can obtain any relief whatever. Recognizing that fact, the plaintiff contends that as T. F. Garner, the father, was liable for the support of his infant son, he is entitled to his services, and had the right to make the contract; that the divorce in 1905, followed by the re-marriage in 1906, did not affect his rights or liability with respect to his son; that Mrs. Garner ratified her husband's contract by her acts of approval at El Paso and Juarez, above referred to, and that she should not be permitted to defeat his contract by the subsequent contract made by her with Holland. On the other hand, it is insisted that when the Garner parents were divorced in 1905, and the custody of Mack was awarded to his mother, the father was thereby deprived of all his rights

to the control of Mack, and that the mother retained those rights, although she and her husband were subsequently re-married.

Furthermore, Sarah M. Garner relies upon her appointment as statutory guardian of the property of Mack Garner, and the subsequent approval of the Iowa district court, of that contract.

Plaintiff's counsel has displayed great industry in bringing to our attention the cases which support the proposition that the judgment of divorce granted to Mrs. Garner in 1905, with the custody of her son, Mack Garner, did not relieve his father from his liability to support his infant son, or deprive him of the correlative right to his son's services. But, in view of the re-marriage of the parents in 1906, it is wholly beside the question to discuss the divorce proceedings of 1905. The re-marriage annulled the judgment of divorce and restored the parents to all their rights over their children as if they had never been divorced.

Usually, it is provided by statute that a judgment of divorce may be annulled upon the joint application of the divorced parties. The same result, however, is obtained by a formal re-marriage of the parties. But, in either case, the result upon the status of the parties with respect to each other, or their relation to their children is the same; and, under the law of Iowa their rights are equal. Rowe v. Rug, 117 Iowa 606, 94 Am. St. Rep. 318.

It has often been held that upon the death of a mother to whom a child has been awarded by a decree of divorce, the father becomes entitled to the custody of his child. Schammel v. Schammel, 105 Cal. 261; Bell v. Krauss (Cal.), 146 Pac. 874; In re Neff (Wash.), 58 Pac. 383; Ex Parte Clarke (Neb.), 118 N. W. 474.

So, whenever the judgment of divorce is annulled the parents' rights with respect to their children are reinstated as if no divorce had been granted. That being true, whatever rights T. F. Garner had over his infant son in 1914, were not affected by the divorce of 1905, because it had been annulled by the re-marriage of 1906.

Moreover, since Cain can win only upon the strength of his contract, it is unnecessary to consider the effect of the Holland contract. The case is to be determined upon the major proposition as to what was the effect of the Cain contract upon the infant Mack Garner. If it was not

binding upon him, the injunction was erroneously granted, and should be dissolved.

Counsel for the plaintiff concede the general doctrine that the contract of an infant for the performance of labor or personal services, is voidable at his election, and that Cain's contract with Mack Garner is not enforcible against him if it should be treated as the contract of Mack Garner only, and not the contract of his father. The contract with Cain purports to be the covenant of Mack Garner, acting through his father. All the covenants are between Mack Garner and Cain; T. J. Garner undertakes nothing. He cannot breach his contract because he made none. He is not even made a defendant to this action. The injunction went against Mack Garner, not against his father. The contract must, therefore, be treated as the covenant of the infant Mack Garner, whether it be treated as executed directly by him, or by his father for him.

But in 22 Cyc. 584, it is said:

"An infant is not bound by a contract made for him or in his name by another person purporting to act for him unless such person has been duly appointed his guardian or next friend and authorized by the court to act and bind him; but the person so contracting is himself bound."

See also Slusher v. Weller, 151 Ky. 203.

It may be conceded that a parent is entitled to his child's services, and that the child owes obedience to the parent; but it will hardly be contended that a parent could come into a court of equity and successfully ask for an injunction to prevent his son from working for some one else. And, if a court would not grant such relief to a parent, it certainly would not grant it to a third person to whom the parent had attempted to transfer the right to the son's service.

The contract in question cannot be treated as an indenture of apprenticeship under the laws of Iowa. By its terms, Cain is under no obligation whatever to teach the boy, or to develop him as a jockey. It is a simple contract for the personal services of an infant, for a stipulated compensation to the father.

The case, therefore, is reduced to the simple proposition of enforcing the executory contract of an infant. It is elementary law that, except for necessaries, an infant may avoid any contract made by him during infancy.

1 Bl. Com. 465; 22 Cyc. 580; Breckenridge v. Ormsby, 1 J. J. M. 236; Watson v. Cross, 2 Duv. 147; Forsee's Admr. v. Forsee, 144 Ky. 171.

And, as to his contract for personal services, 22 Cyc. 599, says:

"An infant may enter into a contract for the performance of labor or personal services, and although such contract is not binding upon him, but voidable at his election, it is not void, and cannot be avoided by the other party, but the infant may recover the wages due him under the contract."

See also Ray v. Haynes, 52 Ill. 485, and Danville v. Amoskeag Mfg. Co., 62 N. H. 133; the first case holding that an infant may quit service before the expiration of his contract term, and the second, that a contract not to quit work without a specified notice is not binding upon an infant.

Cain's contract being unenforceable against the infant defendant, it follows that the injunction was improperly granted, and it is now dissolved.

Judges Carroll, Thomas and Clarke heard the argument, and concur in this opinion.