SMITH, WATERS, KUEHN, BURNETT & HUGHES, LTD., *et al.*, Plaintiffs-Appellees, v. ROBERT W. BURNETT, Defendant-Appellant.

Third District   No. 3—89—0380

Opinion filed December 20, 1989.—Rehearing denied February 7, 1990.

694

James D. Broadway, of Westervelt, Johnson, Nicoll & Keller, of Peoria (Daniel L. Johns, of counsel), for appellant.

Walter W. Winget, of Winget & Kane, and Baymiller, Christison & Radley, both of Peoria (James F. Kane and Andrew W. Covey, of counsel), for appellees.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Robert Burnett (Burnett), appeals from an order of the circuit court of Peoria County granting a preliminary injunction to plaintiffs, Lester Berry Smith (Smith) and Smith, Waters, Kuehn, Burnett & Hughes, Ltd. (SWKB & H). The order restrained Burnett, an attorney, from soliciting clients for workers' compensation and personal injury cases in most Illinois counties. Burnett argues that the order should be reversed, because: (1) plaintiffs failed to establish the requisites for injunctive relief; (2) the compensation provision in his employment agreement with SWKB & H was vague and indefinite, rendering the agreement unenforceable; (3) such a restriction on an attorney's ability to practice law violates public policy; and (4) the restrictive covenants in the employment contract were unenforceable. We reverse and remand.

SWKB & H, formerly known as Lester Berry Smith, Ltd., is a professional corporation engaged in the practice of law. The firm has an office in Peoria and specializes in representing injured parties in personal injury and workers' compensation cases. The firm has an extensive practice throughout southern and central Illinois. Burnett began working for Lester Berry Smith, Ltd., in 1981.

In 1984, Smith, the sole shareholder, decided to sell his stock in the firm. Burnett and three other attorneys from the firm agreed to purchase the stock in February of that year. On February 7, 1984, Smith and the firm executed a contract that was labeled as a consulting agreement. Under the terms of this agreement, Smith was to receive 10% of the total fees collected by the firm for the next 10 years and certain other remuneration. The agreement further provided that Smith could provide consulting services for the firm for three years but was not required to do so.

Section 5.02 of the contract prohibited Smith from soliciting or accepting business from any firm clients for a period of 10 years. This provision also barred Smith during the same period from opening an

office within a 50-mile radius of a certain intersection in Peoria, a certain intersection in Urbana, and the county courthouse in Effingham.

The recitals in the beginning of the agreement included the following statement:

"The Consultant will be effectively precluded from receiving the remuneration specified in this Agreement unless each of the Shareholders enter into employment agreements incident to which each is precluded from competing with the Corporation during and after the cessation of their employment with the Corporation for a period of time."

Each of the four new shareholders, including Burnett, signed employment agreements with the corporation the same day Smith entered into the consulting agreement.

Burnett's employment agreement contained the following relevant provisions:

"03.01 The Corporation hereby offers to employ the Employee to perform such services in respect of the Business as may periodically be designated by the Corporation and in accordance with such rules, regulations and procedures as may periodically be promulgated by the Corporation.

03.02 The Employee hereby accepts the Corporation's offer and agrees to work full time and devote the Employee's attention and best abilities exclusively to the services of the Corporation. The Employee shall refrain from engaging in, directly or indirectly, as an employee or otherwise, any other activity for monetary gain.

\*\*\*

04.01 The services shall commence this date and shall continue for an initial term ending March 1, 1994."

Plaintiffs contend that section 3.02 of the contract is a negative covenant which prohibits Burnett from working for another employer or performing legal services on his own during the term of the agreement which is set forth in section 4.01. Whenever the term "negative covenant" is used in the remainder of this opinion in relation to the employment agreement, it refers to section 3.02. The term "restrictive covenant," when used in relation to the employment agreement, refers to section 6.02. This provision of the contract prohibits Burnett from doing any of the following during the term of the agreement and for 36 months thereafter: (1) contacting any SWKB & H client for purposes of solicitation; (2) accepting business from any client of the firm; (3) communicating any information concerning firm clients to any person; and (4) having an office within 50 miles of a certain street

intersection in Peoria, the courthouse in Effingham, or an intersection in Urbana.

The compensation provision of Burnett's employment contract is found in section 5.00, which states as follows:

"The Corporation shall pay the Employee, and the Employee agrees to accept for services rendered on behalf of the Corporation, a fixed salary computed at an annual rate periodically determined by the Parties, payable as determined by the Parties."

Burnett left a letter of resignation on his desk at SWKB & H on May 27, 1989, and opened his own law office in Naperville, Illinois, in Du Page County. On June 6, plaintiffs filed their complaint for preliminary and permanent injunctive relief against Burnett, including an order restraining him from practicing law in Illinois with anyone except SWKB & H until March 1, 1994.

A hearing concerning plaintiffs' request for a preliminary injunction was held on June 13, 1989. Michael Waters testified at the hearing that he was an attorney who worked for SWKB & H and was one of its shareholders. Waters stated that 90% to 95% of the firm's cases were personal injury or workers' compensation cases, and the firm took cases from almost anywhere in Illinois south of Interstate 80. Burnett was in charge of the firm's workers' compensation calls for the Peoria area and the Champaign area. He also handled some cases on the firm's Danville call.

Waters stated that due to the nature of the firm's practice, union business agents were important sources of client referrals and it was essential to maintain contact with these agents. Many union members turned to the agents for advice when they needed to hire attorneys. Burnett kept in contact with the business agents in the Champaign and Danville areas. According to Waters, Burnett had a unique ability to maintain the trust of the agents in those areas.

Smith introduced Burnett to the business agents in the Champaign and Danville areas. Before Smith sold his stock, the firm would rotate attorneys into different areas regularly so they would not develop too close a relationship with the business agents or other important contacts. Smith also did not allow the firm's attorneys to meet with clients outside the office without his permission. These policies were discontinued after Smith sold his stock because the four new shareholders all signed 10-year employment contracts. Waters stated that Burnett could not have developed his extensive contacts with the business agents and other union personnel were it not for Smith's introductions.

According to Waters, Burnett possessed confidential information about the firm. This included information about sources of referrals other than business agents, about the financial condition of the firm, and about clients. Waters testified that defendant received over $500,000 in compensation from the firm since signing the employment agreement in 1984, including more than $200,000 in 1988.

In Waters's opinion, Burnett's departure had caused harm to the firm. On May 30, 1989, the day Burnett's resignation letter was found and the following day, a number of clients called and discharged the firm. One client stated that he did not believe the firm had the manpower to handle his case. Waters testified that it would be very difficult to measure in terms of dollars the amount of damage that resulted from Burnett's departure because it would be hard to determine the fees that would have been generated from the clients who discharged the firm and difficult to determine how many potential clients were lost as a result of Burnett's actions.

Brian Kuehn, one of the other shareholders at SWKB & H, also testified. Kuehn stated that Burnett knew about the firm's financial condition and this was very important because many of the clients were not able to finance their litigation. Burnett was also aware that Smith was no longer an active member of the firm.

Kuehn felt it was possible that the names of many union business agents could be discovered merely by telephoning the unions. Burnett was aware, however, that in several unions, the union steward was the primary source of referral rather than the business agents. The names of those stewards would be difficult to discover.

Burnett testified that he informed his colleagues at SWKB & H on or about March 7, 1989, that he would soon be leaving the firm. After leaving SWBK & H, he opened the law office of Robert Burnett, Ltd., in Naperville, Illinois. Burnett admitted that he placed advertisements in local newspapers in Champaign and Danville which appeared shortly after he left SWKB & H. These ads for his new office mentioned his availability for workers' compensation and personal injury cases.

Burnett testified that after he opened the new office, he accepted business from only one SWBK & H client, and that was with the firm's permission. Burnett told other SWKB & H clients who called that he had agreed not to solicit any firm clients in his employment contract.

According to Burnett, one of the other shareholders who purchased a portion of Smith's stock, Henry Gentry, was dismissed from the firm by the other shareholders in 1986. The firm did not seek to

enforce the restrictive covenant in Gentry's employment contract, which was the same agreement Burnett had signed. Another former attorney with the firm, Jay Robeson, who handled workers' compensation and personal injury cases throughout central Illinois, left in 1984 and was currently specializing in the same fields of law. Robeson never signed an employment agreement with SWKB & H.

SWKB & H currently had two associate attorneys, Steven Glancey and Michael Brandow, neither of whom had signed employment contracts. Glancey had been with the firm two or three years and handled personal injury and workers' compensation cases throughout central Illinois. Brandow had only been with the firm one or two months.

Burnett testified that the shareholders would agree on compensation from time to time as funds became available. Each of the shareholders received 25% of the available funds. Initially, Burnett had received a lesser percentage than Waters.

The trial court granted plaintiffs a preliminary injunction prohibiting Burnett from soliciting clients for workers' compensation and personal injury cases in any Illinois county except Cook, Du Page, Will, Kane, McHenry, and Lake. Burnett filed a timely notice of appeal from the preliminary injunction order.

■ A party must establish the following in order to demonstrate entitlement to injunctive relief: (1) that he or she possesses a clearly ascertained right which needs to be protected; (2) that he or she will suffer irreparable harm without injunctive relief; (3) that there is no adequate remedy at law; and (4) that he or she is likely to be successful on the merits of the case. (*Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 672.) Appellate review of an order granting or denying a preliminary injunction is limited to a determination of whether the trial court abused its discretion. *Shodeen*, 162 Ill. App. 3d at 673.

Burnett initially contends that his employment contract is unenforceable for want of consideration and because of the indefinite nature of the provision concerning compensation. Plaintiffs contend that this argument is without merit since Burnett received over $500,000 in compensation from the firm after executing the employment agreement. We need not consider the issue of whether the agreement is enforceable because even if it is, plaintiffs failed to establish an entitlement to injunctive relief.

■ Plaintiffs argue that the trial court entered the preliminary injunction in order to protect their rights under sections 3.02 and 4.01 of the employment agreement to have Burnett work exclusively for

the firm until March 1, 1994, rather than to enforce their rights under the restrictive covenant in section 6.02. It is well settled that a court may not order specific performance of a contract for personal services. (See *Rath v. Degener* (1933), 352 Ill. 135, 138; *Rabinovich v. Reith* (1905), 120 Ill. App. 409, 412.) In *Rabinovich* defendant entered into an agreement to work for plaintiff as a hat trimmer but left plaintiff's employ shortly thereafter. Plaintiff sought an injunction to bar defendant from engaging in the occupation of hat trimming in the City of Chicago. The court held that the denial of injunctive relief in *Rabinovich* was proper, noting that defendant never agreed not to work for any other employer while employed by plaintiff and then stating as follows:

"We find nothing unique or extraordinary in this employment of trimming hats. It is undoubtedly true that appellee is well skilled in her work, but that work is largely mechanical and must follow the prevailing fashion to be acceptable to purchasers. It does not appear that the loss of her services inflicts irreparable damage upon appellants." *Rabinovich*, 120 Ill. App. at 418.

Unlike the contract in *Rabinovich*, Burnett's employment agreement does contain a negative covenant requiring him to refrain from working with other employers during the duration of his contract with the firm. Although Burnett argues to the contrary, section 3.02 of the agreement states that Burnett will devote his best efforts exclusively to the firm and engage in no other activity for monetary gain. This provision prohibits Burnett from working for another law firm or practicing law on his own during the term of his employment contract.

In several cases from other jurisdictions, courts have held that an injunction will be granted to restrain violation of negative covenants in a personal service contract forbidding employees from working for any other employer during the term of the contract if the employee is an individual of exceptional and unique knowledge and ability in performing the services called for in the agreement. (*Dallas Cowboys Football Club, Inc. v. Harris* (Tex. Civ. App. 1961), 348 S.W.2d 37, 42; *Winnipeg Rugby Football Club v. Freeman* (N.D. Ohio 1955), 140 F. Supp. 365, 366-67; *Associated Newspapers v. Phillips* (2d Cir. 1923), 294 F. 845, 850; *Philadelphia Ball Club, Ltd. v. Lajoie* (1902), 202 Pa. 210, 212, 51 A. 973, 974.) In most American cases in which courts of review have held that employers were entitled to injunctive relief to restrain violations by former employees of such negative covenants in employment contracts, including three of the four above-

cited cases, the former employees were athletes. (See, *e.g.*, *Munchak Corp. v. Cunningham* (4th Cir. 1972), 457 F.2d 721; *Washington Capitols Basketball Club, Inc. v. Barry* (9th Cir. 1969), 419 F.2d 472; *Houston Oilers, Inc. v. Neely* (10th Cir. 1966), 361 F.2d 36; *Nassau Sports v. Peters* (E.D. N.Y. 1972), 352 F. Supp. 870; *Matuszak v. Houston Oilers, Inc.* (Tex. Civ. App. 1974), 515 S.W.2d 725; *Central New York Basketball, Inc. v. Barnett* (1961), 19 Ohio Op. 2d 130, 181 N.E.2d 506.) There are also some older cases involving entertainers in which similar relief was afforded. (See, *e.g.*, *Keith v. Kellermann* (S.D. N.Y. 1909), 169 F. 196; *McCaull v. Braham* (S.D. N.Y. 1883), 16 F. 37.) Plaintiffs have not cited nor has our research uncovered a single American case in which injunctive relief was sought or granted to restrain the breach of such a negative covenant in an employment contract by an attorney.

This does not necessarily mean it would be inappropriate under any circumstances to issue such an injunctive order against an attorney, especially if the attorney possessed unique or extraordinary skills. In the case at bar, however, plaintiffs do not claim that Burnett is an exceptional attorney or that he has extraordinary skills in handling personal injury or workers' compensation cases. Instead, plaintiffs argue that Burnett has demonstrated great ability in maintaining good relationships with union business agents and other union officials who refer clients to the firm, thereby helping the firm to maintain a steady flow of clients. According to the testimony of Waters and Kuehn, Burnett did this by remaining accessible to these union officials and through thoughtful gestures, such as stopping by the various union halls during the Christmas season with bottles of liquor. Burnett also organized and arranged for talks by attorneys from the firm to union members on various legal topics.

We do not wish to diminish the importance of the role Burnett played in helping the firm to maintain good relations with the union business agents and other sources of referral. This is not a role, however, which required unique or extraordinary skills. As we have seen, the court in *Rabinovich* stated in upholding the denial of injunctive relief that while defendant may have been a very good hat trimmer, this was not a unique or extraordinary skill. (*Rabinovich*, 120 Ill. App. at 418.) In the case at bar, Burnett displayed organizational abilities in arranging the talks by firm attorneys to union members. There is nothing extraordinary or unique about being able to organize such an activity. Burnett was also very courteous to the business agents and other personnel, remaining accessible to them and giving them small gifts during the holidays. We do not believe that courtesy should be

considered a unique or extraordinary skill, especially in a profession in which courteous treatment of members of the general public should be commonplace.

■ The evidence also reveals that Burnett was diligent in attempting to maintain a good relationship with the union personnel. While courtesy, diligence, and organizational ability are certainly admirable traits, they are not the types of unique or exceptional skills that would justify enforcement of a negative covenant in an employment agreement by means of injunctive relief. To the extent that the injunction entered in this case was premised upon Burnett's violation of the negative covenant in his employment agreement, it was error.

Plaintiffs contend in the alternative that the injunction could have properly been based upon the restrictive covenants in section 6.02. That provision prohibits Burnett during the duration of his employment contract and for three years thereafter from: (1) contacting any client of the firm for purposes of solicitation; (2) accepting any business from any clients of the firm; (3) communicating any information concerning firm clients to any person; and (4) having an office within 50 miles of a certain street intersection in Peoria, the courthouse in Effingham, or a certain intersection in Urbana. Since Burnett's office is in Naperville, well over 50 miles from the above cities, the final restriction has not been breached. Plaintiffs are apparently concerned only with the first two restrictions we have mentioned, solicitation and acceptance of business from their clients.

Burnett argues that any injunction based upon the restrictive covenants in section 6.02 was improper because there was no evidence presented at the hearing that he had violated any of the covenants or intended to do so. Burnett admitted that he had placed advertisements in Champaign and Danville newspapers in an attempt to attract potential clients with workers' compensation and personal injury cases shortly after he left SWKB & H. Burnett also testified that several SWKB & H clients called him after he opened his new office. Burnett only accepted business from one of these clients, however, and that was with the consent of the firm. He told the other callers he had agreed in his employment contract not to solicit any of the firm's clients and advised them to contact the firm. This testimony was not contradicted by any other evidence, although Waters testified that a number of clients discharged SWKB & H shortly after Burnett left the firm.

■ The general advertisements placed in the newspapers by Burnett did not constitute contacting SWKB & H clients for solicitation purposes in violation of section 6.02. The term "solicit" "implies per-

sonal petition and importunity addressed to a particular individual to do some particular thing." (Black's Law Dictionary 1249 (5th ed. 1979).) Solicitation of legal services, as opposed to advertising, connotes a private communication directed at a person or category of persons known by an attorney to have an immediate potential need for legal services. (See Ill. Ann. Stat., ch. 110, par. 2—103, Committee Comments (Smith-Hurd 1983).) Thus, the general advertisements placed in the Champaign and Danville newspapers by Burnett did not constitute solicitation of SWKB & H clients in violation of the restrictive covenant.

■ The fact that a number of clients discharged the firm after Burnett's departure does not constitute evidence that he violated the restrictive covenants by soliciting them or accepting business from them. Michael Waters testified that it was his impression from speaking to the former clients and to certain business agents that the dismissals resulted primarily from concern over the firm's manpower and stability. Although this would indicate that the dismissals resulted from Burnett's departure, it does not mean he solicited those clients. If these clients were concerned primarily with the stability and manpower at SWKB & H, as Waters testified, it is highly unlikely they would take their business to Burnett, a sole practitioner whose new office had been in business for a matter of days.

■ ■ As we have seen, one of the requisites for injunctive relief is that the party seeking it is likely to suffer irreparable harm if no injunction is granted. (*Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 431.) Proof of a speculative possibility of injury is not sufficient to meet this requirement. (*In re Marriage of Strauss* (1989), 183 Ill. App. 3d 424, 429; *Smith Oil Corp.,* 127 Ill. App. 3d at 431.) The trial court does not have to wait until an injury actually occurs to grant an injunction. (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 505; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 137.) In *Shorr Paper Products,* however, there was evidence that defendant had actually solicited some of plaintiff's customers. In *Armour & Co.,* there was evidence that the former employees intended to solicit plaintiff's customers. In the case at bar, there was no evidence that Burnett solicited any SWKB & H clients or intended to do so, nor was there any evidence that he accepted any business from the firm's clients or intended to do so. In the absence of such evidence, injunctive relief premised upon the restrictive covenants was improper. It would have been sheer speculation for the trial court to have concluded plaintiffs were likely to suffer irreparable harm from breaches of the restrictive

covenants when they presented no evidence that defendant had violated the covenants or intended to do so.

Because there was no basis for injunctive relief in the case at bar, we conclude the trial court abused its discretion in granting a preliminary injunction. In light of our disposition of this matter, we need not consider the other arguments raised by Burnett. The order of the circuit court of Peoria County is reversed, and the cause is remanded.

Reversed and remanded.

UNVERZAGT, P.J., and McLAREN, J., concur.