DAVIDE W. TOMEI, Plaintiff-Appellant, v. EDWIN E. TOMEI *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—90—1903

Opinion filed September 2, 1992.

Bishop, Callas & Wagner, of Crystal Lake (Robert J. Wagner, of counsel), for appellant.

Bell, Boyd & Lloyd, of Chicago (John P. Scotellaro and Randy J. Curato, of counsel), for appellees.

JUSTICE TULLY delivered the opinion of the court:

On November 30, 1989, the trial court granted a temporary restraining order in favor of Affiliated Insurance Consultants (AIC), enjoining appellant Davide Tomei from soliciting any AIC clients in accordance with a stock purchase agreement, which prohibited the solicitation of AIC clients by Davide Tomei. Pursuant to this agreement, AIC agreed to pay Davide for his stock in AIC on an installment basis. Because Davide allegedly breached the nonsolicitation covenant of the agreement, AIC withheld $10,024 of installment payments as liquidated damages. Both parties motioned for summary judgment and injunctive relief, to enforce their respective rights under the stock purchase agreement. On June 1, 1990, the trial court entered summary judgment in favor of AIC, enjoining Davide from soliciting any AIC accounts and denying Davide's summary judgment motion and his demand for payment of the money withheld by AIC. Davide appeals from both orders.

Davide and Edwin Tomei are brothers. Prior to the initiation of this litigation, appellant Davide Tomei (Davide) was the controlling principal of AIC. Appellee Edwin Tomei (Edwin) was a shareholder and director of AIC. Both Davide and Edwin owned a 41.7% interest of the issued and outstanding shares of AIC. In 1978, the parties entered into a restrictive stock purchase agreement, wherein both parties were given a right of first refusal, to purchase the other party's share, prior to a sale to any third party.

In April 1987 Davide received a written proposal from Whitney Financial Corporation, to purchase his shares in AIC. Although Davide never offered to sell his stock to Whitney Financial, he delivered a copy of the proposal to AIC, with a note, indicating that Whitney Financial would be inspecting AIC's records. Edwin refused to allow any inspection of the company's records. As a result, Whitney Financial withdrew its proposal in May 1987. Prior to Whitney's withdrawal, Edwin sent a letter to Davide, outlining his own proposal for the purchase of Davide's share of the company, in accordance with the provisions of the restrictive stock purchase agreement. The letter contained a price term of $137,889 for the stock, allegedly calculated using the pricing method stated in the restrictive stock purchase agreement. The letter also set a closing date of July 2, 1987.

In an effort to forestall the sale of his stock, Davide filed a declaratory judgment action against Edwin, requesting that the court enjoin Edwin and AIC from selling or otherwise transferring Davide's share of the company and to declare that no binding contract for the sale of Davide's stock existed between Davide and Edwin. In addition, Davide requested that the court define the relative rights of the parties under the restrictive stock purchase agreement. Davide also alleged that the value of Edwin's offer was 10% of the purchase price proposed by Whitney Financial. According to the Whitney proposal, the fair market value of the stock was at least $1.275 million. Appellant further alleged that he had personally guaranteed over $1.4 million of AIC's long-term debt.

This initial litigation was settled by the negotiation of a stock purchase agreement (the Agreement) in October 1987 wherein Edwin and AIC agreed to buy out Davide's shares for $1.125 million. This agreement contained a nonsolicitation covenant, prohibiting Davide from soliciting or attempting to solicit any AIC customers until October 1990.

In early 1989 Davide approached an AIC customer, John Broderick, at a meeting of the Chicago Regional Trucking Association. Broderick said his insurance (with AIC) was getting too expensive. In response, appellant informed Broderick that "he had a really good thing going in insurance" and that he "could do [Broderick] a lot of good." He also told Broderick of his three-year nonsolicitation agreement and asked Broderick if he could get in touch with him at the end of this time. Broderick agreed and said he would look forward to it. Davide Tomei had previously solicited Broderick to buy AIC insurance several years earlier.

Some months later, Broderick received the following advertising package from Davide: (1) An "Overview and Analysis" from the American Inter Fidelity Exchange describing available insurance protection and listing Davide Tomei as one of its directors; (2) a newspaper clipping, describing falling premiums in the insurance industry; (3) an advertising flier for Accountable Carrier's Insurance Agency, in the form of a "phone memo" from Davide Tomei to the president of the target company, with Davide's phone number and the message: "Get ready for another liability insurance cost and availability crunch!" The memo was marked "Please Call" and "Rush"; (4) a prepaid reply postcard addressed to David Tomei, inviting the recipient to request more information about self-help insurance; and (5) an advertisement in the form of a letter-invitation from Davide Tomei on Accountable Carriers Insurance stationery, targeted at trucking com-

panies. In addition, a red rubber-stamped message next to Davide's name said: "We believe your expiration is near—please call me for $ pricing."

At his deposition, Davide stated that he briefly spoke with Broderick about the self-help insurance project he was working on and mentioned that he was "under a non-compete [contract] until the fall of '90." He personally designed and prepared the advertising package which had been mailed to Broderick. The ad campaign was part of a mass mailing to over 800 companies in the trucking industry. Davide obtained the "expiration of insurance list" from the Illinois Commerce Commission. The original list contained 1,300 companies, which Davide reduced to 800 by the elimination of "movers, tankers, couriers, the [AIC] customers I could remember, people that I knew that I wasn't interested in calling on again."

Broderick mailed the advertising materials to his agent at AIC. On April 28, 1989, AIC notified Davide that these materials clearly constituted solicitation in violation of section 2.03 of the stock purchase agreement. As a result, AIC declared that it was entitled to liquidated damages in the amount of twice the previous year's commission earned on the Broderick account. AIC stated that it would deduct this amount, or $10,024, from the balance owed to Davide under the stock purchase agreement. Davide responded with a demand for full payment under the stock purchase agreement and declared the entire amount of the outstanding balance under the Agreement as immediately due and payable.

AIC and Edwin Tomei filed a verified motion for temporary restraining order and preliminary injunction enforcing the nonsolicitation covenant of settlement agreement. In response, Davide filed a counterpetition for declaratory judgment, demanding enforcement of the settlement agreement.

On November 30, 1989, the trial court granted AIC's temporary restraining order, finding that Davide had breached the nonsolicitation covenant and prohibited him from attempting to solicit other AIC accounts. The parties then filed cross-motions for summary judgment on their respective petitions for declaratory relief. On June 1, 1990, the Honorable Monica D. Reynolds granted AIC's summary judgment motion, entering a permanent injunction against Davide prohibiting any further solicitation of AIC's clients. Davide's summary judgment motion to enforce the stock purchase agreement and accelerate the balance was denied.

On appeal, Davide raises two issues: (1) whether he, in fact, breached the nonsolicitation covenant of the stock purchase agree-

ment, through his contacts with John Broderick, an AIC customer; and (2) whether the Agreement's liquidated damages provision is actually a penalty, and thus, unenforceable.

Section 2.03 of the stock purchase agreement reads:

> *"Non-Solicitation of Trucking Accounts*
>
> Notwithstanding the terms and provisions of Section 2.02, Davide agrees that until the third anniversary of the date of this Agreement neither (a) he in his individual capacity, nor (b) he as employee, agent or independent contractor of any other individual or entity, nor (c) any entity in which he may be interested as a partner, officer, employee or shareholder, *shall directly or indirectly in any manner persuade or attempt to persuade* any trucking or Allied account which was a customer or account of Affiliated on August 24, 1987 *to discontinue its relationship with Affiliated or solicit or divert or attempt to solicit or divert any such customer or account from Affiliated.* \*\*\* The publication of advertisements in newspapers, journal, television, radio, or other forms of media communication to the public generally, or to the trucking industry specifically, shall not be deemed a solicitation or breach of this section." (Emphasis added.)

Appellant does not dispute the validity and effect of this provision. The single issue is whether appellant's contacts with John Broderick, a former Affiliated customer, amounted to a breach of this provision. Appellant argues that his conversation with Broderick and the mailing of insurance advertisements to him did not constitute a "solicitation" as a matter of law. Appellant contends that because he told Broderick about his three-year nonsolicitation agreement, the other statements made to him could not have been a solicitation. Secondly, appellant contends the advertising package was part of a mass mailing to the trucking industry and thus, was a "media communication" to the trucking industry, specifically exempted from the nonsolicitation covenant.

■ Whether a particular client contact constitutes a solicitation depends upon the method employed and the intent of the solicitor to target a specific client in need of his services. In this case, the direct solicitation of insurance customers, as opposed to a general advertisement, suggests a private communication directed at a person or persons, known by the solicitor to have an immediate or potential need for insurance. (*Smith, Waters, Kuehn, Burnett & Hughes, Ltd. v. Burnett* (1989), 192 Ill. App. 3d 693, 703, 548 N.E.2d 1331, 1336.) In *Smith*, the court refused to find a breach of a nonsolicitation agree-

ment by an attorney who placed general legal advertisements in local newspapers.

▮ In the instant case, Davide Tomei engaged in a direct mailing campaign, specifically targeted at trucking companies known to have insurance policies soon to expire. Clearly, this was a "solicitation" specifically targeted at known potential new clients. Although this might have otherwise been exempted as a "media communication" to the trucking industry, Davide specifically targeted companies whose insurance was about to expire. Moreover, Davide narrowed the original industry list of 1,300 to 800 companies, eliminating Affiliated customers and undesirable target customers. This course of calculated conduct by Davide belies his contention that this was a media communication to the trucking industry, specifically, or to a random group of trucking companies within the industry.

Secondly, Davide approached John Broderick, known by Davide to be an AIC customer, and told him that he "had a really good thing going" and that he could get Broderick "a good deal." Although Davide told Broderick of the nonsolicitation covenant, he asked Broderick if he could contact him at the end of the three-year prohibition period, presumably to sell him insurance. Davide claims that these statements did not violate the covenant since they were intended to solicit Broderick's business at a future time, when the covenant would no longer be in effect.

We cannot agree. The plain language of the covenant prohibits any actual or attempted solicitation, in any manner, of any AIC trucking account or any attempt to divert any such customer from Affiliated. To exempt the solicitation of *future* business from the covenant would virtually nullify its very purpose. Such an interpretation would allow Davide Tomei free to solicit any or all of AIC's clients, so long as he informed them of the three-year nonsolicitation covenant. Moreover, of the $1.125 million owed by AIC to Davide under the stock purchase agreement, $833,750 was allocated for Davide's compliance with the nonsolicitation covenant. This reenforces the notion that Davide was prohibited from soliciting AIC's clients for present or future business.

The final issue on appeal concerns the validity of the liquidated damages provision. Section 2.07 of the stock purchase agreement reads:

> *"Liquidated Damages*
>
> If Davide breaches any term or condition of [the nonsolicitation covenant], then he shall pay to Affiliated as liquidated damages the sum of two times the previous year's commissions

paid to Affiliated for the customer or account to which the breach relates."

■ For a liquidated damages provision to be held enforceable, two conditions must exist: (1) the damages resulting from a breach must be difficult to calculate; and (2) the amount of fixed damages must be a reasonable forecast of the damage likely to occur. (*Bauer v. Sawyer* (1956), 8 Ill. 2d 351, 359, 134 N.E.2d 329, 333; *Callahan v. L.G. Balfour* (1989), 179 Ill. App. 3d 372, 377, 534 N.E.2d 565, 568.) In *Callahan*, plaintiff was a regional salesman for defendant company. Upon termination, plaintiff began working for one of defendant's competitors. Plaintiff's employment contract contained a covenant not to compete, which, upon breach, allowed defendant to withhold salary and commissions due plaintiff as liquidated damages. The court held this provision unenforceable as a penalty, since there was no relationship between the salary owed to plaintiff and the actual damages caused by his breach.

■ In the case at hand, damages resulting from an attempted solicitation are clearly difficult to calculate, since an attempted solicitation may or may not result in future damage to AIC. The method of calculation in the damage provision is directly tied to the previous year's commission earned by AIC from the customer whom Davide Tomei solicited or attempted to solicit. This appears to be a fair and reasonable scheme for fixing damages. It is true, in some cases, the attempted solicitation will never mature and no actual damage will be incurred by AIC. However, where an attempt is successful, the permanent loss of a customer could result in forfeited commissions, far beyond two years.

For all of the foregoing reasons, the decision of the circuit court of Cook County is affirmed in all respects.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.