# Illinois Official Reports

## Appellate Court

*Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc.*,
2017 IL App (3d) 160761

| | |
|---|---|
| Appellate Court Caption | QUALITY TRANSPORTATION SERVICES, INC., Plaintiff-Appellant, v. MARK THOMPSON TRUCKING, INC., an Illinois Corporation, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-16-0761 |
| Filed | October 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 15-L-114; the Hon. Eugene P. Daugherity, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | William R. Kohlhase, Katherine L. Swise, and Mark D. Walton, of Miller, Hall & Triggs, LLC, of Peoria, for appellant.<br><br>Tomasz Koziol, of Kurt E. Vragel, Jr., P.C., of Glenview, for appellee. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Justices Lytton and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    On appeal, plaintiff, Quality Transportation Services, Inc. (QTS), contends that the trial court erred by granting summary judgment in favor of defendant, Mark Thompson Trucking, Inc. (MTT). QTS argues that a question of material fact exists concerning whether MTT engaged in the solicitation of one of QTS's clients in breach of the nonsolicitation covenant contained in the transportation brokerage agreement. We reverse and remand.

¶ 2                                    FACTS

¶ 3    This case involves a contract dispute arising from the language of a transportation brokerage agreement, dated July 26, 2011, between plaintiff, QTS, an Illinois corporation, and defendant, MTT, an Illinois corporation. The terms of the agreement provided that QTS, a broker licensed by the Federal Motor Carrier Safety Administration, hired MTT, a registered carrier, to provide transportation services to QTS's customers. The agreement contained a nonsolicitation provision in paragraph 19, which stated as follows, in relevant part:

"CARRIER will not solicit traffic from any [s]hipper, consignor, consignee, or customer of Broker where (1) the availability of such traffic first become[s] known to CARRIER as a result of BROKER's efforts, or (2) the traffic of the shipper, consignor, consignee or Customer of BROKER was first tendered to CARRIER by BROKER. If CARRIER breaches this Agreement and directly or indirectly solicits traffic from customers of BROKER and obtains traffic from such customer during the term of this Agreement or for twelve (12) months thereafter, CARRIER shall be obligated to pay BROKER, for a period of fifteen (15) months thereafter, commission in the amount of thirty-five percent (35%) of the transportation revenue resulting from traffic transported for the Customer, and CARRIER shall provide BROKER with all documentation requested by BROKER to verify such transportation revenue."

¶ 4    Pursuant to the July 2011 agreement, MTT began providing trucking services for US Silica Company (USS), one of QTS's customers. MTT provided motor carrier services for USS between the company's Ottawa and Utica facilities and the Rochelle facility.

¶ 5    In 2016, QTS filed an amended complaint against MTT alleging MTT directly or indirectly solicited USS in violation of the nonsolicitation clause of the agreement. The amended complaint alleged that on June 16, 2015, MTT began hauling traffic for USS over the same routes QTS assigned to MTT. QTS claimed that as a result of QTS's efforts, this traffic was first tendered to MTT by QTS during the term of the 2011 agreement. QTS asserted that "[b]ut for [MTT's] solicitation of traffic from USS, [MTT] would not be engaged in hauling for USS directly along the[se] lanes of traffic." According to the amended complaint, QTS received written notice from MTT of MTT's intent to terminate the agreement on June 29, 2015, two weeks after MTT began hauling directly for USS.

¶ 6    On August 23, 2016, MTT filed an answer to QTS's first amended complaint. MTT denied that the company breached the nonsolicitation provision in the agreement. MTT also denied that USS "was a shipper, consignor, consignee or customer of QTS."

¶ 7    On September 9, 2016, MTT filed a motion for summary judgment on all of QTS's claims. In the motion, MTT argued that the undisputed material facts showed that MTT did not solicit business from USS because it was undisputed USS initiated contact with MTT. MTT claimed

the agreement allowed MTT to accept unsolicited business from QTS's client. Alternatively, MTT submitted the nonsolicitation provision of the agreement was unenforceable as a matter of law.

¶ 8     In support of the motion for summary judgment, MTT attached the deposition transcripts of several witnesses, including Janice Casey and Mark Thompson. In his deposition, Thompson, the president of MTT, testified that, while the agreement with QTS was in place, MTT provided hauling services for QTS that included shipments for USS with routes from Ottawa to Peru, Ottawa to Rochelle, and Utica to Rochelle. Thompson understood that QTS received a brokerage fee by charging the QTS customers for whom MTT was hauling freight more money than QTS paid MTT.

¶ 9     Thompson spoke with Casey in December 2014 at the Lotz Trucking Christmas party. Thompson testified that he does not recall the conversation but they did not discuss business. Thompson testified that he and Casey previously attended the same high school but they had not kept in contact following graduation.

¶ 10     Thompson testified that Casey initiated contact with Thompson by telephoning him in the winter of 2015 to discuss the possibility of MTT hauling for USS. Casey stated that USS was short on trucks and asked Thompson if he was interested in working for USS. Thompson testified that he told Casey he was interested and Casey stated she wanted to meet sometime. According to Thompson, when Casey first approached him, Thompson thought, "boy this would be a good outfit to get."

¶ 11     Thompson testified he met with Casey a few days later at the McDonald's in Peru, Illinois. Thompson chose the location. Casey and another hauler, Brian Ruff, were also present at the meeting. Thompson stated that he called Ruff and asked him to attend the meeting because Thompson learned that USS was looking for more than one carrier. Thompson testified the purpose of the meeting with Casey was to discuss the possibility of Thompson and Ruff providing trucking services for USS. Thompson testified that Casey mentioned that she wanted trucks for the routes from Utica to Rochelle and from Utica to Peru and requested that Thompson submit a rate for the route from Utica to Peru. Thompson responded that he would give it some thought but did not discuss or submit any specific rates during the meeting at the McDonald's in Peru, Illinois.

¶ 12     Thompson testified that on the following day, February 12, 2015, Casey stopped by the MTT office to pick up Thompson's proposed rate for the Utica to Peru route. This bid was not accepted by USS because MTT's bid was too high.

¶ 13     On February 13, 2015, MTT submitted a rate to Casey for the USS route from Utica to Rochelle. The bid submitted by MTT to USS took the form of a proposed "Load and Rate Confirmation Agreement" between MTT and USS, which provided as follows:

> "This agreement is presented in good faith between [MTT] and [USS]. [MTT] will supply one truck and trailer and more as needed to transport silica sand to C.S.S. (U.S. Silica) Rochelle from Q.P.S. (U.S. Silica) Utica for a rate of $8.59/ton (all in)."

USS did not accept this bid. On March 3, 2015, MTT lowered the bid for the USS route from Utica to Rochelle to $7.75 per ton. This bid was not accepted by USS. Thompson also submitted a rate proposal to USS for the route from Ottawa to Rochelle. All the routes for which MTT submitted rate proposals to USS were routes that MTT had previously hauled for USS pursuant to the agreement between MTT and QTS.

¶ 14     Several months later, in June 2015, Thompson had an opportunity to discuss his rate proposal with Casey. Casey told Thompson, "[Y]ou need to lower the rate, you know, that's way out of the ballpark, you know." On June 16, 2015, MTT again lowered its bid for the route from Utica to Rochelle to $7.50 per ton and submitted it to USS. USS accepted the $7.50 per ton rate for the Utica to Rochelle route, and MTT began hauling directly for USS on or about June 18, 2015. Thompson testified that he terminated the agreement with QTS by sending a text message to the QTS dispatcher in the middle of June 2015. Thompson testified that he did not submit rate proposals for services to any other shipper during the same time period.

¶ 15     Casey's deposition testimony was consistent with Thompson's deposition testimony. According to Casey, she is employed by USS as the transportation coordinator for the company. Her assigned duties required her to approach carriers, trucking companies, and drivers and request the submission of rates for USS traffic. According to Casey, USS would advise the prospective carriers about the origin and destination of each route and wait for the carriers to submit bids for USS's business. Once Casey received a rate, she would submit it to USS's corporate office for approval. Casey did not have the authority to make an offer to any carrier, including MTT, or to accept any bid from a carrier. If the rate was not accepted by the corporate office, Casey could ask the carrier to submit a new quote at a lower rate. If the carrier did not submit a lower rate, then the process ended.

¶ 16     Casey testified that she has known Thompson for over 20 years and they went to high school together. Casey testified that in late 2014 or early 2015 she reached out to Thompson's nephew, Dalton, and asked for Thompson's phone number. After Casey obtained Thompson's number from Dalton, she called Thompson and asked him "if he had any trucks available" because USS was short on trucks. Thompson replied that he did and Casey asked Thompson if he would propose a rate. However, Thompson did not submit a rate at that time.

¶ 17     Casey testified that she was not familiar with QTS and that her day-to-day communications were with Lotz Trucking, Inc. (Lotz). Casey testified that from September 2014, when she started with USS, through about June of 2015, she was not aware that MTT was under contract with a transportation broker. Casey testified that it was her understanding that Thompson was previously working for Lotz.

¶ 18     Sometime after the initial phone conversation between Casey and Thompson, Thompson began submitting rates for USS routes and then submitted requotes when he was informed his bids were not good enough. Thompson continued to communicate with Casey until the corporate office of USS accepted one of MTT's proposed rates. Thereafter, Thompson began hauling for USS on a load-to-load basis, but Casey could not recall the date that MTT first started working directly for USS. MTT hauled for USS on routes from Utica to Rochelle, Ottawa to Rochelle, and Utica to Vectora. Casey testified that neither Thompson nor anyone at MTT solicited her or USS for business.

¶ 19     In opposition to MTT's summary judgment motion, QTS submitted the affidavit of Kevin Kuntz, the president of QTS and Lotz. In the affidavit, Kuntz stated that Lotz is not a transportation broker but is a motor carrier that provides transportation services to shippers. QTS shares dispatch services with Lotz such that all carriers brokered by QTS are dispatched by Lotz dispatchers. Kuntz stated that when a shipper such as USS needs transportation services from QTS's carriers, the shipper contacts Lotz dispatchers to convey this need, and a Lotz dispatcher will dispatch carriers brokered through QTS to fulfill the shipper's request.

¶ 20 Kuntz also stated in his affidavit that QTS has had a business relationship with USS in La Salle County, Illinois, since 1993 pursuant to which, QTS, acting as broker, has arranged for motor carriers to transport silica sand for USS. Kuntz stated that, prior to the opening of the USS facility in Rochelle, Illinois, in 2012, QTS negotiated and entered into a motor carrier agreement with USS to provide trucking services for traffic from the USS facility in Ottawa, Illinois, to the new facility in Rochelle. Additionally, Kuntz stated that, prior to the opening of the USS facility in Utica, Illinois, in 2014, QTS negotiated and entered into a motor carrier agreement with USS to provide trucking services from Utica to Rochelle.

¶ 21 The trial court held a hearing on defendant's motion for summary judgment on November 15, 2016. Without indicating the basis for the court's ruling, the trial court summarily granted MTT's motion for summary judgment in MTT's favor. On December 9, 2016, QTS filed a notice of appeal.

¶ 22 ANALYSIS

¶ 23 On appeal, QTS challenges the trial court's November 15, 2016, order granting summary judgment in favor of MTT by arguing that a genuine issue of material fact exists as to whether MTT's conduct violated the nonsolicitation provision of the contract QTS seeks to enforce. MTT argues that the trial court correctly granted its motion for summary judgment because the agreement allowed MTT to accept unsolicited work from an existing QTS client. Alternatively, MTT claims that the nonsolicitation provision in the agreement is unenforceable.

¶ 24 The standard of review on an appeal from a trial court's ruling on a motion for summary judgment is *de novo*. *DeSaga v. West Bend Mutual Insurance Co.*, 391 Ill. App. 3d 1062, 1066 (2009). Summary judgment is a drastic means of disposing of litigation and should only be permitted when the right of the moving party is clear and free from doubt. *Woods v. Pence*, 303 Ill. App. 3d 573, 575-76 (1999). At the summary judgment stage, the trial court cannot weigh evidence, make credibility determinations, or decide the truth of the matter but, instead, must determine whether the case should go to trial at all. *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 88; *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, ¶ 25. In other words, the role of the trial court is not to try a question of fact but to determine if one exists. *DeSaga*, 391 Ill. App. 3d at 1066. Summary judgment should be granted only where the pleadings, depositions, and admissions on file, together with any affidavits, when viewed in the light most favorable to the nonmoving party, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Pekin Insurance Co. v. Pulte Home Corp.*, 404 Ill. App. 3d 336, 339 (2010). A triable issue of fact precluding summary judgment exists where the material facts are disputed or, where the material facts are undisputed, reasonable persons might draw divergent inferences from the undisputed facts. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993).

¶ 25 In this case, we must construe the scope of conduct prohibited by the precise language of the nonsolicitation clause in the written agreement. The court's primary goal in interpreting a contract is to give effect to the intent of the parties. *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 18. When the language of the contract is clear and unambiguous, the parties' intent must be determined solely from the language of the contract itself and be given its plain and ordinary meaning. *Id.* Contracts should be construed as a whole, with each

provision viewed in light of other provisions in the contract. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). The construction, interpretation, or legal effect of a contract is a question of law subject to *de novo* review on appeal. *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020 (2009).

¶ 26    To address QTS's contention that a genuine issue of material fact exists as to whether MTT's conduct constitutes solicitation, we look to the language of the nonsolicitation provision contained in paragraph 19 of the agreement:

> "CARRIER will not solicit traffic from any [s]hipper, consignor, consignee, or customer of Broker where (1) the availability of such traffic first become[s] known to CARRIER as a result of BROKER's efforts, or (2) the traffic of the shipper, consignor, consignee or Customer of BROKER was first tendered to CARRIER by BROKER. If CARRIER breaches this Agreement and directly or indirectly solicits traffic from customers of BROKER and obtains traffic from such customer during the term of this Agreement or for twelve (12) months thereafter, CARRIER shall be obligated to pay BROKER, for a period of fifteen (15) months thereafter, commission in the amount of thirty-five percent (35%) of the transportation revenue resulting from traffic transported for the Customer, and CARRIER shall provide BROKER with all documentation requested by BROKER to verify such transportation revenue."

The term "solicit" is not defined in the agreement. However, both parties agree that it is appropriate to use the definition of "solicitation" contained in Black's Law Dictionary, which defines the term as "[t]he act or an instance of requesting or seeking to obtain something" and "[a]n attempt or effort to gain business." Black's Law Dictionary 1520 (9th ed. 2009). The parties further agree that, based on the language of the contract, the mere passive acceptance of business would not violate the terms of the nonsolicitation provision because the term "solicitation" connotes taking some affirmative measures.

¶ 27    Illinois law provides guidance on the type of conduct that constitutes solicitation. In *Tomei v. Tomei*, the First District Appellate Court stated that "[w]hether a particular client contact constitutes a solicitation depends upon the method employed and the intent of the solicitor to target a specific client in need of his services." *Tomei v. Tomei*, 235 Ill. App. 3d 166, 170 (1992). There, the court held that "the direct solicitation of insurance customers, as opposed to a general advertisement, suggests a private communication directed at a person or persons, known by the solicitor to have an immediate or potential need for insurance." *Id.*

¶ 28    QTS argues that *Tomei* is instructive and supports QTS's argument that a proper analysis of whether a party has "solicited" business involves a fact-intensive inquiry of multiple considerations regarding the conduct of each party. In our view, simply because MTT did not initiate the very first conversation with USS does not support an automatic conclusion that MTT's subsequent communications with USS can never rise to the level of solicitation.[1] See, *e.g.*, *YCA, LLC v. Berry*, No. 03 C 3116, 2004 WL 1093385, at *10-11 (N.D. Ill. May 7, 2004) (applying Illinois law and rejecting the notion that the identity of the party who makes the initial contact is outcome dispositive in determining whether solicitation occurred).

---

[1]Both sides rely on authority from various federal circuit courts to support their positions. We find it unnecessary to look to decisions from other jurisdictions because Illinois case law addresses what conduct constitutes solicitation. See *Sadler v. Creekmur*, 354 Ill. App. 3d 1029, 1037 (2004).

¶ 29    We recognize it is undisputed that Casey, acting as an agent for USS, initiated the first phone call to Thompson in early 2015. However, following the first telephone call, there were additional communications arguably initiated by MTT after large gaps of time that followed Casey's initial phone call. Based on our *de novo* standard of review, when viewing the evidence in the light most favorable to the nonmovant, reasonable minds may differ as to whether MTT's multiple and arguably separate contacts with USS violated the nonsolicitation provision of the agreement between QTS and MTT. See *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008) (a triable issue precluding summary judgment exists where the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts). While the facts are not contested, these facts could logically support different conclusions regarding MTT's intent to solicit business away from QTS for the same routes that MTT was covering for QTS as part of the agreement. For these reasons, we reverse the trial court's grant of summary judgment in favor of MTT and remand the matter for further proceedings for a trier of fact to determine whether MTT's conduct amounts to solicitation in violation of the agreement.

¶ 30    As a final matter, we address whether the nonsolicitation provision is unenforceable, as MTT contends. The trial court did not expressly address this issue. The question of whether a restrictive covenant is enforceable is a question of law, the determination of which is reviewed *de novo* on appeal. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. The Illinois Supreme Court has stated that, while a contract in total and general restraint of trade is void as against public policy, a restrictive covenant that imposes a partial restraint on trade will be upheld if the restraint is reasonable and the agreement is supported by consideration. *Id.* ¶ 16.

¶ 31    Here, we conclude that QTS has a legitimate interest in protecting its customer relationship with USS pertaining to a very finite number of routes MTT had driven on behalf of QTS. As QTS argues, invalidating the nonsolicitation provision at issue would completely undermine the business of brokers like QTS. Contrary to MTT's contentions, there is also sufficient evidence in the record to show that QTS had a significant, long-standing business relationship with USS pertaining to the routes at issue.[2] Kevin Kuntz's affidavit stated that, since 1993, QTS, acting as broker, has arranged for motor carriers to transport silica sand for USS.

¶ 32    Here, the nonsolicitation provision is narrowly tailored to protect but not exceed QTS's legitimate business interest. The restriction is limited to a one-year period after the termination of the agreement and only prohibits MTT from soliciting work directly from QTS's customers for the particular traffic that MTT had either hauled or became aware of as a result of QTS's efforts. The agreement allows MTT to accept unsolicited business from USS. Given the very limited and reasonable restrictions of the provision, we conclude the nonsolicitation requirement set forth in the agreement does not impose an undue hardship on MTT and is not injurious to the public. For these reasons, we conclude that the nonsolicitation provision

---

[2]MTT also asserts that QTS does not have a "near-permanent relationship" with USS. However, whether QTS has a "near-permanent relationship" with USS is no longer outcome-determinative. See *Reliable Fire Equipment Co.*, 2011 IL 111871, ¶ 43 (stating the previously accepted two-factor test, in which a near-permanent customer relationship and the employee's acquisition of confidential information through his employment are determinative, is no longer valid). Instead, whether a legitimate business interest exists is based on the totality of the facts and circumstances of each case. *Id.*

contained in the agreement is reasonable and enforceable.

¶ 33                                        CONCLUSION
¶ 34            The judgment of the circuit court of La Salle County is reversed and remanded.

¶ 35            Reversed and remanded.