2021 IL App (3d) 190489

Opinion filed March 4, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| QUALITY TRANSPORTATION SERVICES, INC., an Illinois Corporation, | ) ) ) | Appeal from the Circuit Court of the Thirteenth Judicial Circuit, La Salle County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0489 Circuit No. 2015-L-114 |
| MARK THOMPSON TRUCKING, INC., an Illinois Corporation, | ) ) ) | |
| Defendant-Appellee. | ) ) ) | The Honorable Eugene P. Daugherity, Judge, presiding. |

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices O'Brien and Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1        In this second appeal from a case involving a contract dispute arising from the language

of a transportation brokerage agreement, plaintiff, Quality Transportation Services, Inc. (QTS),

contends that the trial court erred by finding that defendant, Mark Thompson Trucking, Inc.

(MTT), did not violate the nonsolicitation clause of their agreement. QTS argues that MTT,

through the agency of Mark Thompson, breached the clause by submitting trucking rates to a

client of QTS, even though it was the client that requested said rates. We affirm the trial court's

judgment.

## I. BACKGROUND

This case returns to us after the trial court ruled for the defendant following a bench trial. The terms of the agreement provided that QTS, a broker licensed by the Federal Motor Carrier Safety Administration, hired MTT, a registered carrier, to provide transportation services to QTS's customers. The agreement contained a nonsolicitation provision, which stated in relevant part:

> "CARRIER will not solicit traffic from any [s]hipper, consignor, consignee, or customer of Broker where (1) the availability of such traffic first become[s] known to CARRIER as a result of BROKER's efforts, or (2) the traffic of the shipper, consignor, consignee or Customer of BROKER was first tendered to CARRIER by BROKER. If CARRIER breaches this Agreement and directly or indirectly solicits traffic from customers of BROKER and obtains traffic from such customer during the term of this Agreement or for twelve (12) months thereafter, CARRIER shall be obligated to pay BROKER, for a period of fifteen (15) months thereafter, commission in the amount of thirty-five percent (35%) of the transportation revenue resulting from traffic transported for the Customer, and CARRIER shall provide BROKER with all documentation requested by BROKER to verify such transportation revenue."

Pursuant to the agreement, MTT began providing trucking services for US Silica Company (USS), one of QTS's customers. MTT provided motor carrier services for USS from its Ottawa and Utica facilities to its Rochelle facility.

On February 10, 2015, USS regional logistics manager Janice Casey called Thompson to know if MTT was interested in working for USS. Casey attended high school with Thompson,

but they were not socially acquainted. Her intention in calling Thompson was "to hire trucks" and thus initiated the process of negotiating with MTT by approaching Thompson and requesting that he provides rates. In the negotiating process of the trucking industry, the shipper (in this case USS) would request a bid from the carrier (MTT in this case); if the bid is accepted, a contract is formed; but if the bid is refused, the carrier has an opportunity to submit further bids until the parties either reach an agreement or end the negotiation.

¶ 6        On February 11, 2015, Casey met Thompson and discussed rate proposals for transportation from USS's Utica facility to its Peru and Rochelle facilities. On February 12, 2015, Casey called Thompson seeking rates on the Utica to Peru route. Thompson submitted a bid for the Utica to Peru route for $3.73 per ton; USS rejected his bid. On August 5, 2015, Thompson submitted another bid for the same route at $3 per ton; USS accepted this bid. On August 7, 2015, MTT began hauling on the Utica to Peru route.

¶ 7        On February 13, 2015, MTT submitted a bid for the Utica to Rochelle route in the amount for $8.59 per ton. Casey approached MTT with a counteroffer, and MTT submitted a lower bid of $7.75 per ton on March 3, 2015. That bid was rejected, and MTT submitted a third bid of $7.50 per ton on June 16, 2015, which was accepted. On June 18, 2015, MTT began hauling for USS on the Utica to Rochelle route.

¶ 8        During the period of bidding and rebidding, Thompson did not tell Casey that he was under contract with QTS. He did not ask Casey about routes that he had hauled for QTS under the agreement nor did he refuse to submit his bids upon her request.

¶ 9        On June 16, 2015, Thompson texted QTS dispatcher saying that he "quit." On June 17, 2015, Kevin Kuntz—QTS's president—became aware that MTT was hauling directly for USS when another driver saw Thompson at USS Utica hauling to Rochelle. Kuntz and Thompson met

3

on June 22, 2015. Kuntz reminded Thompson that MTT was under contract with QTS and that QTS had given MTT work from USS. Thompson said he remembered he had signed a contract and told Kuntz to "sue him." The two met again on June 26, 2015, when Thompson told Kuntz "it was his time to go out on his own and not work through a broker anymore." Kuntz told Thompson he could do whatever he wanted, just "don't take our lanes." Thompson responded he had decided to go out on his own, that MTT was going to haul for USS, and that QTS could sue him. QTS filed suit for breach of the nonsolicitation clause. On June 29, 2015, QTS received a letter from MTT terminating their agreement.

¶ 10        QTS filed a complaint alleging that MTT breached the nonsolicitation clause. After discovery, the parties filed cross-motions for summary judgment. The trial court granted MTT's motion for summary judgment. On appeal, this court reversed the trial court's decision. *Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc.*, 2017 IL App (3d) 160761, ¶ 1. We concluded that there was a genuine issue of material fact as to whether MTT breached the nonsolicitation clause because "reasonable minds may differ as to whether MTT's multiple and arguably separate contacts with USS violated the nonsolicitation provision of the agreement between QTS and MTT." *Id.* ¶ 29. We explained that "[w]hile the facts are not contested, these facts could logically support different conclusions regarding MTT's intent to solicit business away from QTS for the same routes that MTT was covering for QTS as part of the agreement." *Id.* We also concluded that the nonsolicitation clause was not an improper restrictive covenant and could be enforced against MTT. *Id.* ¶ 32.

¶ 11        On remand, the trial court held a bench trial where Janice Casey testified regarding the bidding and rebidding between MTT and USS. The parties also submitted briefs and points of argument on the issue of solicitation.

4

¶ 12　　　　On July 26, 2019, the trial court issued a written order finding that "[t]he overall context of [the] fact pattern is that U.S. Silica, in the person of Janice Casey, initiated the opening negotiations by her telephone call and meeting with [MTT] soliciting his bids." The court then found that after USS rejected MTT's initial bids, Thompson "had no further contact with U.S. Silica until again being requested by Janice Casey to reduce his prior bid." Finally, the court found that Casey continued to phone Thompson "a couple of times a week during April and May 2015 encouraging him to refigure and resubmit his bids." The court explained:

> "The court determines as a factual matter, this pattern consisted of a negotiation process. Each bid submitted by MTT was not a discrete act unto itself but rather a necessary step in the overall negotiation leading to the ultimate contract. Each submission by MTT was a direct response to a specific request from USS, not an unsolicited request for work initiated by MTT."

The trial court also concluded that the gap in time between Casey's initiating call and the final bid acceptance did not end the bargaining between the parties. Thus, the court held that "in the context of the overall negotiation process [that] as a matter of fact [Thompson and MTT] did not solicit U.S. Silica and therefore did not breach the non-solicitation agreement."

¶ 13　　　　QTS appeals this decision.

¶ 14　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 15　　　　In this appeal, QTS argues that the trial court erred in finding that MTT did not breach the nonsolicitation clause of the agreement. QTS contends that (1) this court should apply a *de novo* standard of review to the trial court's judgment, (2) the trial court did not apply our prior ruling of law to the facts of this case, and (3) MTT violated the nonsolicitation clause. We reject each of QTS's contentions and affirm the trial court's judgment.

5

¶ 16        QTS argues that a *de novo* standard of review should apply to the trial court's judgment because it involved an issue of contract interpretation. We disagree. To "the extent that we are called upon to interpret the contract between the parties, a question of law, we will apply a *de novo* standard of review." *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448 (2009). But, where the trial court's ruling involves factual findings, we will not reverse those findings unless they are against the manifest weight of the evidence. *Id.* at 447-48.

¶ 17        Here, the trial court's ruling involves factual findings. The court concluded that the sequence of bid and rebid created a factual pattern indicative of a negotiation process between the USS and MTT, initiated by USS. The trial court considered this pattern in reaching its judgment. In so doing, the trial court specifically made several factual findings from the trial testimony. We will not reverse those findings unless they are against the manifest weight of the evidence. *Id.*

¶ 18        Despite the trial court's findings, QTS argues that a *de novo* standard of review is appropriate because the trial court failed to apply our ruling in the prior appeal in this case. We disagree. In the prior appeal, we remanded the case for a fact-intensive inquiry to resolve the genuine issue of material fact underlying our reversal of summary judgment in favor of MTT. *Quality Transportation Services, Inc.*, 2017 IL App (3d) 160761, ¶ 29. We noted that the facts of the case, as presented in the cross-motions for summary judgment, "could logically support different conclusions regarding MTT's intent to solicit business away from QTS for the same routes that MTT was covering for QTS as part of the agreement." *Id.* Thus, we ruled that "simply because MTT did not initiate the very first conversation with USS does not support an automatic conclusion that MTT's subsequent communications with USS can never rise to the level of solicitation." *Id.* ¶ 28. Our ruling and reasoning relied on the fact that the subsequent

6

conversations between Thompson and Janice Casey were "*arguably* initiated by MTT after large gaps of time that followed Casey's initial phone call." (Emphasis added.) *Id.* ¶ 29.

¶ 19　　The trial court's findings resolved those doubts. The trial court found that after USS rejected MTT's initial bids, Thompson "had no further contact with U.S. Silica until again being requested by Janice Casey to reduce his prior bid." There is nothing in the record from which to conclude that this finding was against the manifest weight of the evidence. The evidence at trial showed that after a bid was rejected, Thompson only submitted a new bid if Casey requested one.

¶ 20　　In response, QTS argues that the trial court's judgment incorrectly defined solicitation based on which party initiated each bid submission. QTS contends that each bid Thompson submitted, regardless of whether he did so in response to Casey's requests, was an effort to solicit business from USS. We do not agree.

¶ 21　　"Whether a particular client contact constitutes a solicitation depends upon the method employed and the intent of the solicitor to target a specific client in need of his services." *Tomei v. Tomei*, 235 Ill. App. 3d 166, 170 (1992). Thompson submitted each bid to Casey only after she had requested that he did so. Thus, we cannot conclude that Thompson targeted USS with his bidding. In fact, the record shows that when USS rejected a bid, Thompson did not rebid or reinitiate contact with Casey unless—and until—she requested a new bid. Instead, we conclude that USS sought to obtain favorable transportation fees by directly negotiating and developing business opportunities with MTT.

¶ 22　　Nonetheless, QTS contends that Casey clarified her requests for bids were not offers and that she did not have the authority to make offers. QTS also contends that Casey was simply

7

inquiring about MTT's rates—nothing more. QTS thus argues that, in responding to Casey's inquiries, Thompson and MTT made "an attempt or effort to obtain business" from USS.

¶ 23    We reject this argument because it imposes an unreasonable restraint of trade on Thompson and MTT that goes beyond the scope of the nonsolicitation clause. An agreement restricting competition between parties "is reasonable only if the [agreement]: (1) is no greater than is required for the protection of a legitimate business interest ***; (2) does not impose undue hardship on the [promisor], and (3) is not injurious to the public." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 17. In the prior appeal, we concluded that the clause was a valid restrictive covenant between the parties, in part, because it was "narrowly tailored to protect but not exceed QTS's legitimate business interest." *Quality Transportation Services, Inc.*, 2017 IL App (3d) 160761, ¶ 32. In so doing, we found that the "agreement allows MTT to accept unsolicited business from USS." *Id.* QTS's argument asks us to remove MTT's ability to do so.

¶ 24    Under QTS's understanding, Thompson would have to either ignore or reject all inquiry from prospective clients even when he did nothing to initiate the inquiries. This obligation would place an undue burden on Thompson's livelihood because of the limited geographical scope and the nature of MTT's services, regardless of the limited duration of the clause. Thompson provides trucking services in the western central Illinois area and would inevitably have competing interests with QTS, which provides brokerage for those services in the same market. While QTS may protect its legitimate business interest by prohibiting MTT from "taking affirmative measures" to obtain business away from QTS, it cannot prohibit MTT from developing prospective business opportunity that came their way through no fault of theirs. To hold otherwise would be contrary to public policy.

¶ 25    We further note that the interpretation of the nonsolicitation clause urged by QTS also restrains USS from actively soliciting in its own best business interests. USS appears to be attempting to reduce its business expenses by negotiating reduced rates while maintaining its ties with a trucking company with which it has an existing and presumably satisfactory working relationship.

¶ 26                                    III. CONCLUSION

¶ 27    The judgment of the circuit court of La Salle County is affirmed.

¶ 28    Affirmed.

**No. 3-19-0489**

| | |
|---|---|
| **Cite as:** | *Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc.*, 2021 IL App (3d) 190489 |
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 2015-L-114; the Hon. Eugene P. Daugherity, Judge, presiding. |
| **Attorneys for Appellant:** | William R. Kohlhase and Katherine L. Swise, of Miller, Hall & Triggs, LLC, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Christopher Keleher, of Keleher Appellate Law Group, LLC, of Chicago, for appellee. |